SIERRA CLUB MACKINAC CHAPTER
v DEPARTMENT OF ENVIRONMENTAL QUALITY

Docket No. 269181. Submitted August 8, 2007, at Lansing. Decided
January 15, 2008, at 9:10 a.m. Leave to appeal sought.

Sierra Club Mackinac Chapter brought an action in the Ingham
Circuit Court to challenge a declaratory ruling by the Department
of Environmental Quality (DEQ) regarding the DEQ's administra-
tion of the federal Clean Water Act, 33 USC 1251 *et seq.*, with
respect to concentrated animal feeding operations (CAFOs). In
seeking the declaratory ruling, the Sierra Club had alleged that
the DEQ's practice of issuing general permits that allow CAFOs to
develop their own comprehensive nutrient management plans,
without providing an opportunity for public participation in the
permitting process, violated the Clean Water Act by authorizing
the discharge of pollutants without ensuring that water-quality
requirements would be met and by establishing an effluent limi-
tation without public input. The DEQ issued a declaratory ruling
rejecting these claims, and the Sierra Club appealed. The court,
Beverley Nettles-Nickerson, J., affirmed the declaratory ruling,
and the Sierra Club appealed.

The Court of Appeals *held*:

1. The Sierra Club properly sought judicial review of the
DEQ's ruling in state rather than federal court because the
Sierra Club did not contest any action taken by the federal
Environmental Protection Agency; rather, the Sierra Club
asked the respondent for a declaratory ruling that Michigan's
plan for administering the Clean Water Act with respect to
CAFOs was contrary to federal law. Review of declaratory
rulings is proper in state court.

2. The discharge rates of a CAFO's nutrient management plan
are effluent limitations as defined by the Clean Water Act because
they affect the rates of discharge from a point source into navi-
gable waters. Accordingly, in the interest of maintaining the
biological integrity of the nation's navigable waters, the discharge
rates of a CAFO's nutrient management plan must be included in
the terms of the general permit and be subject to meaningful
public review before the permit is approved.

Reversed and remanded for further proceedings.

ZAHRA, J., dissenting, stated that while the Court of Appeals has jurisdiction to consider whether the general permit process violates state law, federal courts have exclusive jurisdiction over claims that the DEQ failed to comply with federal requirements under the Clean Water Act that were not expressly incorporated in Michigan's federally approved permitting program. Because the petitioner has not identified any state statute or regulation that has been violated, the trial court's order should be affirmed.

ADMINISTRATIVE LAW — CLEAN WATER ACT — CONCENTRATED ANIMAL FEEDING OPERATIONS — GENERAL PERMITS — COMPREHENSIVE NUTRIENT MANAGEMENT PLANS.

The discharge rates established in the comprehensive nutrient management plan of a concentrated animal feeding operation are effluent limitations as defined by the federal Clean Water Act and, as such, must be included in the operation's general permit from the Department of Environmental Quality (33 USC 1251 *et seq.*).

*Hicks, Mullett & Gregg, PLLC* (by *Liisa R. Speaker*), and *Field Jerger LLP* (by *Scott Jerger*) for the petitioner.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Alan F. Hoffman*, Assistant Attorney General, for the respondent.

Before: WHITBECK, C.J., and TALBOT and ZAHRA, JJ.

WHITBECK, C.J.

## I. OVERVIEW

Petitioner Sierra Club Mackinac Chapter (the Sierra Club) appeals by leave granted the trial court's order affirming a declaratory ruling issued by the Department of Environmental Quality (DEQ). The DEQ issued the declaratory ruling as a result of administrative proceedings brought by the Sierra Club challenging the

DEQ's administration of certain elements of the Federal Water Pollution Control Act,[1] commonly known as the Clean Water Act.

This case presents three issues for our consideration. First, we must consider whether the Sierra Club properly sought judicial review of the DEQ's declaratory ruling in state court. Second, we must consider whether the discharge rates of a concentrated animal feeding operation's (CAFO) nutrient management plan are "effluent limitations" as the Clean Water Act defines them. And third, if we conclude that such nutrient management plans are effluent limitations, then we must consider whether the DEQ must include the nutrient management plan in the terms of the general permit itself, subject to public review and comment before the DEQ approves the permit.

With respect to the first issue, we conclude that the Sierra Club properly sought judicial review of the DEQ's ruling in state court. Under the circumstances here, state court, rather than federal court, is the proper forum for review of a state agency's declaratory ruling. Regarding the second issue, we conclude that the discharge rates of a CAFO's nutrient management plan are effluent limitations, as the Clean Water Act defines them. We conclude that such discharge rates are effluent limitations because they affect the rates of discharge from a point source into navigable waters. Therefore, in the interest of maintaining the biological integrity of the nation's navigable waters, such discharge rates must be subject to the DEQ's meaningful review. Regarding the third issue, because the Clean Water Act requires public participation in the development, revision, and enforcement of any effluent limitation, we conclude that the DEQ must include a CAFO's

---

[1] 33 USC 1251 *et seq.*

nutrient management plan in the terms of the general permit. Such CAFO nutrient management plans will therefore be subject to public review and comment before the DEQ approves the permit. Accordingly, we reverse and remand.

## II. BASIC FACTS AND PROCEDURAL HISTORY

### A. BACKGROUND

This case concerns the application and construction of § 301 of the Clean Water Act.[2] The Clean Water Act is a federal regulatory statute that is designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[3] The Clean Water Act prohibits the "discharge of any pollutant" into "navigable waters" from any "point source," except when authorized by a permit issued under the National Pollutant Discharge Elimination System (NPDES).[4] The federal Environmental Protection Agency (EPA) or the states, pursuant to federally approved permit systems within their jurisdictions, issue NPDES permits for discharges into navigable waters.[5] State discharge standards and limitations cannot be less stringent than the federal standards and limitations.[6]

The Clean Water Act defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, vessel or other floating craft, from which pollutants are or may be

---

[2] 33 USC 1311.

[3] 33 USC 1251(a).

[4] 33 USC 1311(a), 1342, 1362(12).

[5] See 33 USC 1342, 1370.

[6] 33 USC 1370.

discharged."[7] The "point source" of pollutants at issue here is a concentrated animal feeding operation or "CAFO."[8] The Clean Water Act defines a CAFO by a prescribed number of animals that it stables or confines.[9] A "large CAFO" houses hundreds or thousands of livestock.[10] According to the Sierra Club, confined livestock and poultry operations in the United States— 198 in Michigan—generate millions of tons of manure and waste each year, more than three times the raw waste generated by humans in the United States.

In an effort to dispose of the enormous amounts of liquid and solid waste generated at CAFOs, many CAFO owners and operators apply manure as fertilizer to agricultural fields adjacent to the confinement facilities.[11] Although nutrients in the manure can act as a fertilizer when CAFO owners or operators properly apply it, when such owners or operators excessively or improperly apply it, manure has a number of potentially harmful pollutants that can infiltrate surface and ground waters.[12]

In 1973, the EPA delegated authority to Michigan to administer its own NPDES program. Under the provisions of Michigan's Natural Resources and Environmental Protection Act (NREPA) relating to protection of water resources,[13] the DEQ is responsible for issuing

---

[7] 33 USC 1362(14).

[8] 40 CFR 122.23(b)(2).

[9] 40 CFR 122.23(b)(2); see also Mich Admin Code, R 323.2102(i).

[10] 40 CFR 122.23(b)(4); General Permit No. MIG019000, Part II.A (defining large CAFO).

[11] See General Permit No. MIG019000, Part I.A.4.b.7.

[12] See *Waterkeeper Alliance, Inc v United States Environmental Protection Agency*, 399 F3d 486, 494 (CA 2, 2005), amended 2005 US App LEXIS 6533.

[13] MCL 324.3101 *et seq.*

NPDES permits in Michigan and ensuring that those permits comply with applicable federal law and regulations. Every NPDES permit must set forth effluent (liquid waste) limitations, which are "restriction[s] .... on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters[.]"[14]

In 2003, to address water pollution associated with improper or excessive application of manure by CAFOs, the EPA promulgated the "CAFO Rule,"[15] which required that all CAFO owners or operators either (1) apply for an individual NPDES permit or (2) submit a notice of intent for coverage under an NPDES general permit.[16] To receive a permit, in addition to the generally applicable NPDES permit requirements, CAFOs must satisfy various specific conditions, including developing and implementing a nutrient management plan.[17] A nutrient management plan is a plan to manage the nutrients, that is, manure, litter, and process wastewater, that a CAFO puts on its agricultural fields.

According to the DEQ, the federal CAFO Rule "set forth a framework for states and other permitting authorities to use as a baseline for the development of their own CAFO permitting programs." In light of the changes to the federal scheme, Michigan promulgated its own administrative rules specific to the NPDES for CAFOs,[18] which the EPA reviewed. Like its federal counterpart, Michigan's Administrative Code requires

---

[14] 33 USC 1362(11); see also 40 CFR 122.41(a)(1).

[15] The CAFO Rule is codified within 40 CFR parts 9, 122, 123, and 412.

[16] 40 CFR 122.23(d)(1).

[17] 40 CFR 122.42(e).

[18] Mich Admin Code, R 323.2102, R 323.2103, R 323.2104, and R 323.2196.

all CAFO owners or operators "to apply either for an individual NPDES permit, or a certificate of coverage under an NPDES general permit, unless the owner or operator has received a determination from the department, made after providing notice and opportunity for public comment, that the CAFO has 'no potential to discharge . . . . ' "[19] Like the federal system, the DEQ requires that Michigan CAFOs develop and implement comprehensive nutrient management plans.[20]

In February 2005, a federal court examined and partially vacated the federal CAFO Rule. In *Waterkeeper Alliance Inc v United States Environmental Protection Agency*, the United States Court of Appeals for the Second Circuit addressed how the EPA [was] handling federal nutrient management plans. Specifically, the petitioners in *Waterkeeper*, a group of concerned citizens and environmental interest groups, argued that the federal "CAFO Rule was unlawful because: (1) it empower[ed] NPDES authorities to issue permits to Large CAFOs in the absence of any meaningful review of the nutrient management plans those CAFOs have developed; and (2) it fail[ed] to require that the terms of the nutrient management plans be included in the NPDES permits."[21] After extensive analysis of the regulations and the Clean Water Act, the *Waterkeeper* court agreed with the petitioners and found, in relevant part, that the CAFO Rule (1) "fails to require that permitting authorities review the nutrient management plans developed by Large CAFOs before issuing a permit that authorizes land application discharges," (2) fails to require the inclusion of nutrient management plans in NPDES permits, and (3) "violates the Clean Water Act's

---

[19] Mich Admin Code, R 323.2196(1)(b).

[20] Mich Admin Code, R 323.2196(5).

[21] *Waterkeeper, supra* at 498.

public participation requirements" by "effectively shield[ing nutrient management plans] . . . from public scrutiny and comment."[22]

Underlying *Waterkeeper*'s second and third findings was the conclusion that under the plain language of the Clean Water Act, the terms of each nutrient management plan were "effluent limitations."[23] With respect to the first finding, the court reasoned that "[b]y not providing for permitting authority review of these application rates, the CAFO Rule fails to adequately prevent Large CAFOs from 'misunderstanding or misrepresenting' the application rates they must adopt in order to comply with state technical standards."[24] In other words, "[t]he CAFO Rule does not ensure that the Large CAFOs will, in fact, develop nutrient management plans—and waste application rates—that comply with all applicable effluent limitations and standards."[25] As the court observed, the Clean Water Act "demands regulation in fact, not only in principle."[26]

### B. THE PRESENT CASE

On June 11, 2004, the DEQ issued a general permit, entitled General Permit No. MIG010000 (General Permit I), for Michigan CAFO owners based on the federal CAFO Rule and state administrative rules governing the NPDES program. According to the DEQ, it issues general permits whenever it determines that a specific category of discharges is so similar in type and quality that one permit will provide sufficient control over any

---

[22] *Id*. at 499, 502-504.

[23] *Id*. at 502-503.

[24] *Id*. at 502.

[25] *Id*.

[26] *Id*. at 498.

discharge in that category. The DEQ noticed the proposed general permit, held two public hearings, and accepted written and verbal comments on the proposed general permit, including the Sierra Club's comments.

A business or individual seeking a "certificate of coverage" under the general permit must develop a comprehensive nutrient management plan and submit a "notice of intent" for coverage. According to General Permit I, the comprehensive nutrient management plan "describes the production practices, equipment, and structure(s) that the owner/operator of an agricultural operation now uses and/or will implement to sustain livestock and/or crop production in a manner that is both environmentally and economically sound."[27] The comprehensive nutrient management plan is not part of the permit application nor part of the permit itself, although the DEQ may review it at the CAFO.[28] However, the applicant must include an "executive summary" of its comprehensive nutrient management plan and a copy of the page in the plan that the "Certified CNMP Provider" has signed.[29] The executive summary must include, in pertinent part, "the expected volume of large CAFO waste to be generated per year" and a "brief demonstration that the permittee can properly utilize or dispose of the expected volume of large CAFO waste generated by the permitted facility," including "information on the number of acres available for land application and methods and volume of large CAFO waste utilization or disposal other than land application."[30]

---

[27] General Permit I, Part I.B.1.

[28] See *id.*, Part I.B.2.

[29] *Id.*, Part I.B.2.a. "CNMP" is the acronym for "comprehensive nutrient management plan."

[30] *Id.*, Part I.B.2.a.8.

The general permit sets forth 10 "minimum standards ... to achieve the objective of preventing discharges of pollutants to waters of the State from production areas and from land application activities."[31] The standards are not numerical but descriptive, providing direction to CAFO owners such as: "Prevent introduction of hazardous or toxic chemicals (for purposes of disposal) into manure and wastewater storage structures."[32] The general permit requires the permittee to "annually review the approved [comprehensive nutrient management plan] and update the [comprehensive nutrient management plan] as necessary to meet the requirements of Part I.B."[33] The general permit also requires the permittee to "inspect, monitor, record and keep with the [comprehensive nutrient management plan] for five years, the results of such inspection and monitoring."[34] The CAFO must maintain a copy of the CAFO's comprehensive nutrient management plan and make it available to the DEQ upon request.[35] Finally, the CAFO owner or operator is required to submit annual reports to the DEQ that must include a "statement indicating whether the current version of the CAFO's [comprehensive nutrient management plan] was developed or approved by a certified CNMP provider."[36]

In January 2005, the Sierra Club requested a declaratory ruling from the DEQ on three issues:

> 1. Whether the general permit which allows a CAFO to develop its own Comprehensive Nutrient Management

---

[31] *Id.*, Part I.B.3.

[32] *Id.*, Part I.B.3.e.

[33] *Id.*, Part I.B.2.c.

[34] *Id.*, Part I.B.4.

[35] *Id.*, Part I.B.2.a.

[36] Mich Admin Code, R 323.2196(5)(f)(vii).

Plan specifying how the operator intends to meet the effluent limitations of the [Clean Water Act], without review or approval from the Michigan DEQ and without incorporation of its terms in a permit violates the [Clean Water Act] sections 301 and 402, 33 USC §§ 1311, 1342?

2. Whether the general permit's failure to provide for adequate public participation in the permitting process and enforcement of the [Clean Water Act] standards against CAFOs contravenes [Clean Water Act] section 101(e), 402(a), 402(j), 402(k) and 505, 33 USC §§ 1251(e), 1342(a), 1342(j), 1342(k) and 1365?

3. Whether the general permit violates section 402 of the [Clean Water Act], 33 USC § 1342, and its implementing regulations, by authorizing the discharge of pollutants without ensuring that the discharge will meet the water quality requirements of the [Clean Water Act]?

In June 2005, the DEQ issued Declaratory Ruling 2005-01, rejecting the Sierra Club's claims but directing the Water Bureau of the DEQ to (1) reorganize the "minimum standards" section of the general permit for clarity; (2) identify all proposed "land application areas" and adjacent water bodies at the time a CAFO applies for authorization; and (3) make the comprehensive nutrient management plan submitted in accordance with the general permit's requirements "available to the public upon request." More specifically, regarding the Sierra Club's assertion that the general permit created a self-regulatory scheme, the DEQ responded that the general permit imposes more specific requirements than the federal regulations require inasmuch as the general permit prohibits discharges that may cause or contribute to a violation of state water-quality standards.

The DEQ rejected the Sierra Club's assertion that the general permit violated the public participation requirements of the Clean Water Act, pointing out that

public review and comment was provided when it initially proposed the general permit, that all proposed certificates of coverage and notices of intent are available to the public online for submission of comments, and that public hearings on notices of intent may be requested. The DEQ emphasized that "[r]equests for authorization under the general permit, however, do not require a separate public notice because the discharges are of a similar kind to those contemplated by the general permit." Additionally, the DEQ asserted that it satisfied the Clean Water Act's public participation requirement, which the federal court considered in *Waterkeeper*, by the posting of the notices of intent and certificates of coverage. According to the DEQ, the comprehensive nutrient management plan is not an effluent limitation but a "management plan utilized by CAFOs to meet the effluent limitations." The DEQ ruled that "the [comprehensive nutrient management plan] is neither part of the permit application nor the permit itself and is, therefore, not subject to the public information requirements of the [Clean Water Act]." Nonetheless, because it conceded that the comprehensive nutrient management plan is valuable to both the DEQ and the public in assessing a farm's ability to comply with the general permit's conditions, the DEQ agreed to "in the future require that copies of the [comprehensive nutrient management plans] be submitted to the DEQ" and "available to the public upon request."

The DEQ also rejected the Sierra Club's assertion that the general permit failed to ensure that discharges met the water-quality requirements of the Clean Water Act. The DEQ shared the Sierra Club's "concerns that impaired watersheds must be protected from additional impairment due to CAFO discharges" and that "[t]his concern is precisely why the blanket prohibition on any CAFO discharge that causes or contributes to a viola-

tion of [water-quality standards] is required by Part 31, rather than merely the best available or best conventional technology requirements contained in the federal rule." Similarly, the DEQ opined that the general permit did not violate federal and state antidegredation requirements because the DEQ reviews all requests for authorization to determine the applicability of the general permit to the application request.

The DEQ issued a reorganized general permit in November 2005, which it denoted as General Permit No. MIG019000 (General Permit II).

The Sierra Club appealed Declaratory Ruling 2005-01 in the circuit court. The Sierra Club argued, in pertinent part, that a CAFO's nutrient management plan is an effluent limitation, which requires public review and a public hearing. The Sierra Club claimed that its argument was adopted by the federal court of appeals in *Waterkeeper* and that "this case is on all fours" with *Waterkeeper*.

Ruling from the bench, the circuit court affirmed the DEQ's declaratory ruling for the following reasons:

> The Court has read the applicable Clear [sic] Water Act, 33 USC § 1251e regarding public participation and 33 USC § 1342a, which outlines the administrator [sic] and opportunity for a public hearing to issue a permit. [the Sierra Club] is alleging in essence that the MDEQ's Declaratory Ruling was arbitrary, capricious and a clear abuse of discretion. The Court disagrees. . . .
>
> In this Court's opinion the ruling was ". . . reasonable and logical". The MDEQ did identify some problems with the structure of the general permit and required that MDEQ . . . reformat the general permit. . . . In addition, judging [the Sierra Club]'s concern with the public not having an opportunity to review, comment and/or request a hearing on permits, the ruling required the following: Identification of all proposed land applications and adjacent water; allow a time for a permitee to submit notice of intent to coverage.

Second, to insure the public has an opportunity to provide comment on the notice of intent of any proposed certificate of coverage or making it available on the DEQ website for 14 days and in removing that from the site this feature allows the public to submit comments and ask for public hearing address electronically, acquire a copy of the [comprehensive nutrient management plan] to be submitted [to] the appropriate DEQ Water Bureau District.

The Declaratory Ruling is neither arbitrary, capricious or an abuse of unwarranted discretion. Therefore, the ruling is permitted and affirmed.

Thereafter, this Court granted the Sierra Club's application for leave to appeal.

### III. JURISDICTION

#### A. STANDARD OF REVIEW

The Sierra Club argues that its challenge to the DEQ's declaratory ruling is properly in state court. The DEQ raises the issue of jurisdictional propriety on appeal, but did not raise it below. However, "jurisdictional defects may be raised at any time, even if raised for the first time on appeal."[37] The determination whether the circuit court has jurisdiction is a question of law that we review de novo.[38]

#### B. ANALYSIS

Under Michigan's Administrative Procedures Act (APA),[39] on request of an interested person, an agency may issue a declaratory ruling concerning the applica-

---

[37] *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 97-98; 693 NW2d 170 (2005).

[38] *WPW Acquisition Co v City of Troy (On Remand)*, 254 Mich App 6, 8; 656 NW2d 881 (2002).

[39] MCL 24.201 *et seq.*

bility of statutes, rules, or orders of the agency.[40] " 'A declaratory ruling is binding on the agency and the person requesting it unless it is altered or set aside by any court.' "[41] Under the APA, "[w]hen a person has exhausted all administrative remedies available within an agency, and is aggrieved by a final decision or order in a contested case, whether such decision or order is affirmative or negative in form, the decision or order is subject to direct review by the courts as provided by law."[42] "A declaratory ruling is subject to judicial review in the same manner as an agency final decision or order in a contested case."[43] A state court properly has jurisdiction to review whether a declaratory ruling was in violation of the constitution or a statute; was arbitrary, capricious, or an abuse of discretion; or contained a substantial and material error of law.[44]

The Clean Water Act sets forth the procedure for judicial review of the EPA's approval of a state CAFO permitting program as follows:

> Review of the [EPA] Administrator's action . . . in making any determination as to a State permit program submitted under [33 USC 1342(b)], . . . [and] in issuing or denying any permit under [33 USC 1342], . . . may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person.

---

[40] *Huron Valley Schools v Secretary of State*, 266 Mich App 638, 651; 702 NW2d 862 (2005), quoting MCL 24.263.

[41] *Id.*

[42] MCL 24.301.

[43] MCL 24.263.

[44] MCL 24.306(1)(a), (e), (f); *Adrian School Dist v Mich Pub School Employees Retirement Sys*, 458 Mich 326, 332; 582 NW2d 767 (1998); *Michigan Ass'n of Intermediate Special Ed Administrators v Dep't of Social Services*, 207 Mich App 491, 494-495; 526 NW2d 36 (1994).

Any such application shall be made within 120 days from the date of such determination, . . . issuance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day.[45]

The DEQ asserts that various lower federal courts have held that federal jurisdiction over the EPA's approval of a state permit program is exclusive.[46] The Sierra Club does not dispute this, but instead argues that 33 USC 1369(b)(1) does not apply here because the Sierra Club is "not challenging the EPA's alleged 'approval' of Michigan's CAFO program conveyed in the July 1, 2005 letter." Rather, the Sierra Club argues that it is challenging the declaratory ruling, and cites several lower federal court cases that have held that state decisions regarding permits under the NPDES program are not reviewable in federal court.[47]

In this case, the EPA originally approved Michigan's NPDES permit program in 1973. The approval letter referred to the state's indication of "a willingness and ability to comply with both the spirit and the letter of the" Clean Water Act, and reminded the state of its responsibility to comply with federal standards. Twenty-five years later, in 2003, the EPA issued the CAFO Rule to account for the massive shift in the farming industry to CAFOs,[48] and on June 11, 2004, the DEQ issued General Permit I.

In its August 9, 2004, petition, the Sierra Club argued that Michigan's implementation of the approved

---

[45] 33 USC 1369(b)(1).

[46] See, e.g., *American Canoe Ass'n, Inc v United States Environmental Protection Agency*, 30 F Supp 2d 908, 924 (D Va, 1998); *Chesapeake Bay Foundation, Inc v United States*, 445 F Supp 1349, 1354 (ED Va, 1978).

[47] See, e.g., *American Paper Institute, Inc v Environmental Protection Agency*, 890 F2d 869, 874 (CA 7, 1989).

[48] *Waterkeeper, supra* at 494-495.

plan violated federal law because it did not require a comprehensive nutrient management plan to be submitted and available to the public before the issuance of a discharge permit. On July 1, 2005, after *Waterkeeper* was decided, the EPA issued the following letter:

> Dear [DEQ Director]:
>
> I am writing with regard to Michigan's National Pollutant Discharge Elimination System (NPDES) program for concentrated animal feeding operations (CAFOs).
>
> * * *
>
> USEPA, Region 5, has reviewed the Michigan revised program. We conducted the review under 40 CFR 123.62. With this letter, I am pleased to inform you that we approve the revision.
>
> On February 28, 2005, the United States Court of Appeals for the Second Circuit vacated provisions of the federal regulations which allow permit authorities to issue permits to CAFOs without including the terms of nutrient management plans in the permits, without reviewing plans, and with plans remaining at the CAFO and thus unavailable to the public (*see* Waterkeeper Alliance, *et al*, v USEPA (No. 03-4470 (L)). USEPA, Region 5, has evaluated R 323.2196(5)(b), *Mich. Adm. Code*, in the context of the Waterkeeper decision. This rule provides that, "[a] copy of the CAFO's [Comprehensive Nutrient Management Plan] shall be maintained at the CAFO and made available to the department upon request. In addition, the executive summary shall be submitted to the department." We find that the rule will not prevent the State from administering its program consistent with the Waterkeeper decision. The rule is therefore included within the scope of the approval communicated above. We understand that the State will administer its program consistent with the decision with respect to nutrient management plans. . . .

The DEQ repeatedly points to the EPA's July 2005 letter as evidence that the EPA "approved" Michigan's program after *Waterkeeper*, implying that the Sierra Club is effectively objecting to this "approval" and that this Court therefore may not exercise jurisdiction. Arguably, the EPA's July 2005 letter may indeed operate as some species of an approval. However, the Sierra Club could not have been protesting *this* approval because the Sierra Club requested a declaratory action in August 2004, nearly a year *before* the EPA released this letter. Thus, the Sierra Club did not ask the DEQ to review the EPA administrator's action in "making a[] determination as to a State permit program," as contemplated by 33 USC 1369(b)(1), nor did it ask for state court review of that determination. Rather, the Sierra Club asked the DEQ for a declaratory statement that General Permit I violates the Clean Water Act because it did not require CAFOs to submit a complete comprehensive nutrient management plan for notice and comment before receiving a permit to discharge. Essentially, in its appeal to state court, the Sierra Club objected to the DEQ's declaration that Michigan's NPDES program complied with the Clean Water Act.

As for the content of the EPA's July 2005 letter, it refers to Rule 323.2196, not to either general permit in issue. Further, it does not say that Rule 323.2196 complies with the Clean Water Act and *Waterkeeper*. Indeed, it does not even indicate that the rule will advance compliance with *Waterkeeper*. Rather, it indicates "that the rule will *not prevent* the State from administering its program consistent with the <u>Waterkeeper</u> decision."

The following statement from *American Paper* is applicable: "[T]o find [federal] jurisdiction to review the state permits in this case would mean that Congress intended a most improbable and awkward division of

the review of state-issued permits between state and federal tribunals."[49]

Accordingly, we conclude that jurisdiction is proper in state court because the Sierra Club did not contest any action taken by the EPA administrator. Rather, the Sierra Club asked the DEQ for a declaratory ruling that Michigan's NPDES plan was contrary to federal law. Review of declaratory rulings is proper in state court.

### IV. THE DECLARATORY RULING

#### A. STANDARD OF REVIEW

The Sierra Club argues that Michigan's general permit does not include the required minimum federal effluent limitations and is inconsistent with the Clean Water Act, its implementing regulations, and Michigan state law. This Court's standard for reviewing the lower court's decision reviewing the administrative agency decision requires it to determine, in pertinent part, "whether the lower court applied correct legal principles."[50] Under the APA, when the facts are undisputed, the standard of review is whether the ruling was in violation of the constitution or a statute.[51]

#### B. NUTRIENT MANAGEMENT PLAN AS AN "EFFLUENT LIMITATION"

*Waterkeeper* observed that "[t]he EPA has focused on the [CAFO] industry because CAFOs . . . generate millions of tons of manure every year."[52] Pollutants in this animal waste "can infiltrate the surface waters in a

---

[49] *American Paper, Inc, supra* at 874.

[50] *Boyd v Civil Service Comm*, 220 Mich App 226, 234; 559 NW2d 342 (1996).

[51] *Michigan Ass'n of Intermediate Special Ed Administrators, supra* at 494-495.

[52] *Waterkeeper, supra* at 493.

variety of ways," with "[p]erhaps the most common way . . . [being] through improper 'land application.' "[53] 40 CFR 412.4(c)(1) provides that a nutrient management plan developed by a CAFO must incorporate the following:

> Application rates for manure, litter, and other process wastewater applied to land under the ownership or operational control of the CAFO must minimize phosphorus and nitrogen transport from the field to surface waters in compliance with the technical standards for nutrient management established by the Director. Such technical standards for nutrient management shall:

> (i) Include a field-specific assessment of the potential for nitrogen and phosphorus transport from the field to surface waters, and address the form, source, amount, timing, and method of application of nutrients on each field to achieve realistic production goals, while minimizing nitrogen and phosphorus movement to surface waters; and

> (ii) Include appropriate flexibilities for any CAFO to implement nutrient management practices to comply with the technical standards, including consideration of multiyear phosphorus application on fields that do not have a high potential for phosphorus runoff to surface water, phased implementation of phosphorus-based nutrient management, and other components, as determined appropriate by the Director.[54]

*Waterkeeper* reasoned that "[b]y not providing for permitting authority review of these application rates, the CAFO Rule fails to adequately prevent Large CAFOs from 'misunderstanding or misrepresenting' the application rates they must adopt in order to comply with state technical standards."[55]

---

[53] *Id.* at 494.

[54] 40 CFR 412.4(c)(2).

[55] *Waterkeeper, supra* at 502.

General Permit II provides that a "permittee shall comply" with certain application limitations regarding phosphorus and nitrogen.[56] Application limitations are dependent upon the results of a "Bray P1 soil test" (or other method if allowed by the DEQ).[57] However, a permittee must "conduct a field-by-field assessment of all land application areas" to "determine the form, source, amount, timing, rate and method of application" of CAFO waste.[58] Moreover, "[s]oils at land application sites shall be sampled at a minimum of once every three years to determine phosphorus levels and the results shall be used to determine land application rates."[59] While the general permit provides numerical targets for determining whether land application of waste is a threat to local water supplies, General Permit II delegated to CAFOs the authority to determine and adopt application rates for disposal of waste.

Further, to implement the requirements of a comprehensive nutrient management plan, the CAFO must submit the plan to the DEQ,[60] but the "Certified CNMP Provider" approves such comprehensive nutrient plan.[61] General Permit II defines a "Certified CNMP Provider" as "a person that attains and maintains certification requirements through a program approved by the United States Department of Agriculture Natural Resources Conservation Service."[62] The general permit also states that the DEQ can "determine[] that the [comprehensive nutrient management plan] is inad-

---

[56] General Permit II, Part I.A.4.b.7.c.

[57] Id.

[58] Id., Part I.A.4.b.7.a.

[59] Id., Part I.A.4.b.7.b.B.

[60] Id., Part I.A.5.b, and Part II.A.

[61] Id., Part I.A.5.a.

[62] Id., Part II.A.

equate in preventing pollution."[63] However, the general
permit does not require such a review either before the
permittee is authorized to discharge or thereafter.[64]
Certainly, it makes sense to include CAFOs in the
process of developing discharge rates and plans; how-
ever, the Clean Water Act requires the DEQ to conduct
a meaningful review of the comprehensive nutrient
management plan.[65]

The Clean Water Act "unquestionably provides that
all applicable effluent limitations must be included in
each NPDES permit."[66] The Clean Water Act defines
"effluent limitation" to mean "any restriction estab-
lished by a State or the Administrator on quantities,
rates, and concentrations of chemical, physical, biologi-
cal, and other constituents which are discharged from
point sources into navigable waters[.]"[67] General Per-
mit II charges CAFOs with the task of determining
discharge rates on a field-by-field basis;[68] thus, it could
be argued that the application rates determined under
General Permit II are not effluent limitations because
they are established by a CAFO, not ."a State or the
Administrator." But such an argument frustrates the
Clean Water Act's goal of controlling effluent or pollut-
ant discharges by making them unlawful except as

---

[63] *Id.*, Part I.A.5.d.

[64] See *Waterkeeper, supra* at 499 (observing that "most glaringly, the
CAFO Rule fails to require that permitting authorities review the
nutrient management plans developed by Large CAFOs before issuing
a permit that authorizes land application discharge."). See also 72 Fed
Reg 26582, 26584 (May 10, 2007) ("Permitting authorities would be
required to review the [nutrient management plan] . . . .").

[65] See *Waterkeeper, supra* at 500.

[66] *Waterkeeper, supra* at 502, citing 33 USC 1311(a), 1311(b), 1342(a).

[67] 33 USC 1362(11).

[68] General Permit II, Part I.A.4.b.7.a.

authorized,[69] in order to restore and maintain the "biological integrity" of the nation's waters.[70]

While the phosphorus-testing provisions of General Permit II serve to restrict land discharges somewhat,[71] the DEQ only requires testing after the fact of discharge every three years.[72] Because they affect the rates of discharge from a point source into navigable waters, the CAFO's nutrient management plan application rates are "effluent limitations" that the DEQ must incorporate into the general permit.[73]

### C. PUBLIC PARTICIPATION

With respect to public participation in the process, 33 USC 1251(e) provides as follows:

> Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

The Clean Water Act further provides that there be an "opportunity for public hearing" *before* an NPDES permit issues;[74] that a "copy of each permit application and each permit issued under this section [1342] shall be

---

[69] 33 USC 1311(a).

[70] 33 USC 1251(a).

[71] General Permit II, Part I.A.4.b.7.c.A.

[72] *Id.*, Part I.A.4.b.7.b.B.

[73] See 72 Fed Reg 26582, 26584 (May 10, 2007) ("Permitting authorities would also be required to incorporate terms of the [nutrient management plan] as NPDES permit conditions."); 40 CFR 122.42(3)(e)(1).

[74] 33 USC 1342(a)(1), 1342(b)(3).

available to the public";[75] and that "any citizen" may bring a civil suit for violations of the act.[76]

We first conclude that 33 USC 1251(e), which requires public participation in development, revision, and enforcement of effluent limitations, is applicable to development, revision, and enforcement of the comprehensive nutrient management plans, which we have concluded are effluent limitations. We note further that even if we had not so concluded, 33 USC 1251(e) would nevertheless apply to comprehensive nutrient management plans because they certainly are a "plan" that is subject to public participation.[77]

General Permit II provides that a CAFO must provide a copy of its comprehensive nutrient management plan to the DEQ.[78] However, we conclude that the general permit does not provide for public participation in the process of " 'development, revision, and enforcement' " of a comprehensive nutrient management plan.[79]

The DEQ asserts that the Sierra Club and other "concerned citizens" can access a comprehensive nutrient management plan "through Michigan's Freedom of Information Act." However, this is a rather circuitous path to encouraging and assisting public participation.[80] Requiring the public to obtain a comprehensive nutrient management plan after a CAFO files it with the

[75] 33 USC 1342(j).

[76] 33 USC 1365(a).

[77] See *Waterkeeper, supra* at 504.

[78] General Permit II, Part I.A.5.b.

[79] See *Waterkeeper, supra* at 503, quoting 33 USC 1251(e).

[80] See 72 Fed Reg 26582, 26584 (May 10, 2007) ("Permitting authorities would be required to review the [nutrient management plan] and provide the public with an opportunity for meaningful public review and comment.").

DEQ certainly does not provide the public with any method of meaningful review during its development.

We conclude that Michigan's CAFO permit program does not satisfy the requirements of the Clean Water Act because it does not require inclusion of the required minimum effluent limitations in the general permit and it does not provide for the requisite public participation. Therefore, the trial court's declaratory ruling contains a substantial and material error of law.[81]

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

TALBOT, J., concurred.

ZAHRA, J. (*dissenting*). I respectfully dissent. I conclude that the dispositive issue in this case is whether the Department of Environmental Quality (DEQ) complied with all applicable state statutory and regulatory requirements under Michigan's federally approved program to issue National Pollutant Discharge Elimination System (NPDES) permits to concentrated animal feeding operations (CAFOs). I conclude that the Sierra Club failed to meet its burden of establishing that the DEQ's construction, interpretation, and application of its state permitting program as set forth in the declaratory ruling here under review were arbitrary, capricious, or not in accordance with applicable law. I would affirm the circuit court's order affirming the declaratory ruling issued by the DEQ.

Because I conclude that the dispositive issue before this Court is whether the DEQ's program for the issuance of NPDES permits to CAFOs complies with Michigan law, I agree that this Court has jurisdiction in

---

[81] MCL 24.306(1)(a), (f); *Adrian School Dist, supra at* 332.

this matter. I decline to consider, however, all arguments advanced by the Sierra Club that the DEQ has failed to comply with federal Clean Water Act (CWA) requirements that are not expressly incorporated in Michigan's federally approved NPDES permitting program. To the extent that these arguments are advanced, I would conclude that this Court lacks jurisdiction to consider them. Judicial review of the United States Environmental Protection Agency's (EPA) approval of the DEQ's permitting program is exclusively vested in the United States circuit courts. 33 USC 1369(b).

To be sure, the CWA influences many aspects of our state's permitting process. However, the EPA has authorized Michigan and 44 other states to issue NPDES permits pursuant to state law. In so doing, the EPA determined that Michigan's permitting program is at least as stringent as the federal EPA permit program. As the majority notes, "[i]n 1973, the EPA delegated authority to Michigan to administer its own NPDES program." *Ante* at 535. On July 1, 2005, the EPA approved revisions to Michigan's program for issuing NPDES permits to CAFOs. Upon EPA approval of this program, the federal permitting program was suspended in Michigan and the state program operated in lieu of the federal program. 33 USC 1342(c). See also *Ringbolt Farms Homeowners Ass'n v Hull,* 714 F Supp 1246, 1253 (D Mass, 1989).

Significantly, the EPA's sanction of the Michigan permitting program is not a declaration that the DEQ stands in the shoes of the EPA to administer the EPA's federal permitting process. Likewise, the EPA's approval of Michigan's permitting program is not an indication that the state and federal permitting programs are identical. Rather, the EPA reviewed the overall efficacy of the Michigan permitting program and

determined that, while the state program may be different from the federal program in some aspects, Michigan's program is at least as effective as the federal program in advancing the policies and purposes of applicable federal environmental law.

Because there is no requirement that Michigan's state permitting program be identical to the federal permitting program, any challenge that the state program is insufficient to satisfy the requirements of federal law is either an unsubstantiated state-law claim or a challenge to the EPA's approval of the Michigan permitting program. However, as previously stated, challenges to the EPA's approval of Michigan's state permit program must be pursued in the federal circuit courts. Accordingly, while this matter is properly before this Court, we must limit our review to whether the general permit process challenged by the Sierra Club is contrary to or in some way fails to comply with state law.

As pointed out by the DEQ, the Sierra Club has done little more than make "sweeping assertions that [Michigan's general CAFO] permit is contrary to state law." The Sierra Club has not pointed to any Michigan statute or regulation that has been violated. What the Sierra Club seeks is not information regarding the effluent limitations applicable to entities issued certificates of coverage under a general permit. Here, the Sierra Club sought and received the ability to influence how CAFO operators manage their farms in order to satisfy the effluent limitations set forth in the general permit. Nothing in state or federal law grants the Sierra Club such authority.

I would affirm.