MICHIGAN FARM BUREAU v DEPARTMENT OF
ENVIRONMENTAL QUALITY

Docket No. 290323. Submitted July 7, 2010, at Grand Rapids. Decided
March 29, 2011, at 9:00 a.m.

Michigan Farm Bureau and other farming organizations brought an
action for a declaratory judgment in the Newaygo Circuit Court
challenging an administrative rule promulgated by the Depart-
ment of Environmental Quality. The rule, Mich Admin Code R
323.2196, regulates water quality in accord with the National
Pollutant Discharge Elimination System (NPDES) and requires
owners or operators of concentrated animal feeding operations
(CAFOs) to apply for NPDES permits even if they do not actually
discharge pollutants. The rule includes an exception that allows a
CAFO owner or operator to bypass the permit requirement if it has
received a determination from defendant that the CAFO has no
potential to discharge. Plaintiffs argued that the rule exceeds the
scope of defendant's statutory rulemaking authority, that it is
inconsistent with the intent of the Legislature, and that it is
arbitrary and capricious. Plaintiffs relied on federal caselaw that
had found enactment by the federal Environmental Protection
Agency (EPA) of a similar federal rule exceeded the scope of the
EPA's rulemaking authority. Both parties moved for summary
disposition. The court, Anthony A. Monton, J., concluded that the
rule did not violate federal law, that defendant had statutory
authority to promulgate the rule, that the rule was not inconsis-
tent with legislative intent, and that the rule was not arbitrary or
capricious. Plaintiffs appealed.

The Court of Appeals *held*:

1. When analyzing the substantive validity of an administra-
tive rule, Michigan courts employ a three-part test: (1) whether
the rule is within the subject matter of the enabling statute, (2)
whether it complies with the legislative intent underlying the
enabling statute, and (3) whether it is arbitrary or capricious. A
rule is within the subject matter of the enabling statute if it is
necessary for the efficient exercise of a duty that the Legislature
has conferred on the agency. The Legislature empowered defen-
dant to take all appropriate steps to prevent any pollution of

waters of the state that defendant considered unreasonable and against the public interest. Requiring CAFOs with the potential to discharge to obtain permits before they actually discharged any pollutants was within defendant's statutory duty to prevent pollution.

2. Rule 323.2196 complies with the Legislature's intent because it is consistent with the Legislature's conferring broad powers on defendant, empowering it to prevent any pollution of waters of the state that defendant considers unreasonable and against the public interest.

3. A rule is arbitrary if it was the result of an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance and capricious if it was apt to change suddenly, freakish, or whimsical. Even though it was modeled on the language struck down by the federal courts, Rule 323.2196 is not arbitrary and capricious because defendant has broader powers than its federal counterpart and is free to enact more stringent limitations than federal limitations. There was no evidence that defendant was motivated by caprice or that the rule was promulgated without reference to adequate principles or standards.

Affirmed.

1. ADMINISTRATIVE LAW — RULES — SUBSTANTIVE VALIDITY — SUBJECT MATTER.

When analyzing the substantive validity of an administrative rule, Michigan courts employ a three-part test: (1) whether the rule is within the subject matter of the enabling statute, (2) whether it complies with the legislative intent underlying the enabling statute, and (3) whether it is arbitrary or capricious; a rule is within the subject matter of the enabling statute if it is necessary for the efficient exercise of a duty that the Legislature has conferred on the agency.

2. ADMINISTRATIVE LAW — RULEMAKING — STATUTORY AUTHORITY OF AGENCY.

The Legislature has conferred broad powers on the Department of Environmental Quality and has empowered it to prevent any pollution of the waters of the state that the department considers unreasonable and against the public interest (MCL 324.3106).

3. ADMINISTRATIVE LAW — RULES — ARBITRARY AND CAPRICIOUS.

Mich Admin Code, R 323.2196, which requires owners or operators of concentrated animal feeding operations to obtain water-quality permits, is not arbitrary and capricious because the Department of

Environmental Quality has broader powers than its federal coun-
terpart and is free to enact more stringent limitations than federal
limitations.

Varnum LLP (by *Richard A. Samdal* and *Aaron M. Phelps*) for plaintiffs.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, and *Alan F. Hoffman*, Assistant Attorney General, for defendant.

Before: HOEKSTRA, P.J., and JANSEN and BECKERING, JJ.

JANSEN, J. Plaintiffs commenced this declaratory judgment action in the circuit court to challenge an administrative rule promulgated by defendant, the Department of Environmental Quality (DEQ). The circuit court determined that the challenged rule fell within the scope of the DEQ's statutory rulemaking authority, that it was rationally related to the DEQ's statutory mandate to protect Michigan's waters from pollution, and that it was neither arbitrary nor capricious as a matter of law. The court accordingly granted summary disposition in favor of the DEQ and dismissed plaintiffs' claims. Plaintiffs now appeal as of right, arguing that the challenged rule exceeds the scope of the DEQ's statutory rulemaking authority, that the rule violates the intent of the Legislature, that the rule is arbitrary and capricious, and that the circuit court therefore erred by granting summary disposition in favor of the DEQ. For the reasons set forth in this opinion, we affirm.

I. BASIC FACTS AND PROCEDURAL HISTORY

A. STATUTORY BACKGROUND

The Federal Water Pollution Control Act, commonly known as the Clean Water Act (CWA), 33 USC 1251 *et*

*seq.*, "is a comprehensive water quality statute designed to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' " *PUD No 1 of Jefferson Co v Washington Dep't of Ecology*, 511 US 700, 704; 114 S Ct 1900; 128 L Ed 2d 716 (1994), quoting 33 USC 1251(a). By enacting the CWA, Congress sought to eliminate "the discharge of pollutants into the [nation's] navigable waters" and to attain "an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife . . . ." 33 USC 1251(a)(1) and (2). "Toward this end, the [CWA] provides for two sets of water quality measures." *Arkansas v Oklahoma*, 503 US 91, 101; 112 S Ct 1046; 117 L Ed 2d 239 (1992). These two types of water quality measures are known as "effluent limitations," 33 USC 1311, and "water quality standards," 33 USC 1313.

" 'Effluent limitations' are promulgated by the EPA and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources."[1] *Arkansas*, 503 US at 101. The "primary means for enforcing" these effluent limitations is the National Pollutant Discharge Elimination System (NPDES). *Id*. In particular, "[t]he [CWA] prohibits the 'discharge of any pollutant' into 'navigable waters' from any 'point source,' except when authorized by a permit issued under the [NPDES]." *Sierra Club Macki-*

---

[1] In contrast, " '[w]ater quality standards' are, in general, promulgated by the States and establish the desired condition of a waterway." *Arkansas*, 503 US at 101; see also 33 USC 1313. Water quality limitations serve to "supplement effluent limitations 'so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels.' " *Arkansas*, 503 US at 101, quoting *Environmental Protection Agency v State Water Resources Control Bd*, 426 US 200, 205 n 12; 96 S Ct 2022; 48 L Ed 2d 578 (1976).

*nac Chapter v Dep't of Environmental Quality*, 277 Mich App 531, 534; 747 NW2d 321 (2008), quoting 33 USC 1311(a), 33 USC 1342, and 33 USC 1362(12); see also *Arkansas*, 503 US at 102. "Section 402 [of the CWA] establishes the NPDES permitting regime, and describes two types of permitting systems: state permit programs that must satisfy federal requirements and be approved by the EPA, and a federal program administered by the EPA." *Arkansas*, 503 US at 102.

"Before a state desiring to administer its own program can do so, the [EPA's] approval is required and the state must demonstrate, among other things, adequate authority to abate violations through civil or criminal penalties or other means of enforcement." *Ringbolt Farms Homeowners Ass'n v Town of Hull*, 714 F Supp 1246, 1253 (D Mass, 1989). Once the EPA approves a state's request to administer its own NPDES program, that state's NPDES program is administered pursuant to *state law* rather than federal law. *Id*. In other words, the EPA's authorization of a state-administered NPDES program is " 'not a delegation of Federal authority,' " but instead allows the state-administered program to function " 'in lieu of the Federal program.' " *Id*. (citation omitted); see also *Sierra Club*, 277 Mich App at 556 (ZAHRA, J., dissenting). A state that administers its own NPDES program may adopt discharge standards and effluent limitations that are more stringent than the federal standards and limitations. 40 CFR 123.1(i)(1); *West Virginia Highlands Conservancy, Inc v Huffman*, 625 F3d 159, 162 (CA 4, 2010); see also 40 CFR 123.25(a). However, a state's discharge standards and effluent limitations may not be less stringent than the federal standards and limitations. 33 USC 1370.

In 1973, the EPA granted Michigan the authority to administer its own NPDES program. *Sierra Club*, 277

Mich App at 535; see also *United States v Bay-Houston Towing Co, Inc*, 197 F Supp 2d 788, 801 (ED Mich, 2002). Part 31 of Michigan's Natural Resources and Environmental Protection Act (NREPA), MCL 324.3101 *et seq.*, governs the protection of water resources in this state. Under Part 31 of the NREPA, "the DEQ is responsible for issuing NPDES permits in Michigan and ensuring that those permits comply with applicable federal law and regulations." *Sierra Club*, 277 Mich App at 535-536.

### B. THE FEDERAL CAFO RULE

As explained previously, the CWA requires an individual to seek and obtain an NPDES permit before he or she may discharge pollutants into the nation's navigable waters from any "point source." *Id.* at 534; see also *Arkansas*, 503 US at 102. The CWA defines the term "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, *concentrated animal feeding operation*, or vessel or other floating craft, from which pollutants are or may be discharged." 33 USC 1362(14) (emphasis added). Concentrated animal feeding operations (CAFOs) are "large-scale industrial operations that raise extraordinary numbers of livestock." *Waterkeeper Alliance, Inc v Environmental Protection Agency*, 399 F3d 486, 492 (CA 2, 2005). The federal regulations promulgated under the CWA define and categorize CAFOs depending on the number of animals that they stable or confine.[2] *Sierra Club*, 277 Mich App at 535; see also 40 CFR 122.23(b).

---

[2] The Michigan Administrative Code defines and categorizes CAFOs in a similar manner, according to the number of animals that they stable or confine. See Mich Admin Code, R 323.2102(i).

The EPA first promulgated regulations for CAFOs in the 1970s. *Waterkeeper*, 399 F3d at 494. These initial regulations, "very generally speaking, defined the types of animal feeding operations that qualify as CAFOs, set forth various NPDES permit requirements, and established effluent limitation guidelines for CAFOs." *Id.* Thereafter, in 2001, the EPA "proposed to 'revise and update' the first set of CAFO regulations." *Id.* (citation omitted). The EPA published a proposed new rule for CAFOs and received numerous public comments. *Id.* at 494-495. Ultimately, in 2003, the EPA promulgated its final CAFO rule (the 2003 Federal CAFO Rule), which was codified within 40 CFR parts 9, 122, 123, and 412. National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations (CAFOs), 68 Fed Reg 7176 (February 12, 2003); see also *Waterkeeper*, 399 F3d at 495.

Among other things, the 2003 Federal CAFO Rule as originally promulgated provided that all CAFO owners or operators "must either apply for an individual NPDES permit or submit a notice of intent for coverage under an NPDES general permit." 40 CFR 122.23(d)(1); see also *Waterkeeper*, 399 F3d at 495. The federal rule also contained an exception to this requirement for "CAFOs that have successfully demonstrated *no potential to discharge . . . .*" NPDES Permit Regulation and Effluent Guidelines and Standards for CAFOs, 68 Fed Reg at 7182 (emphasis added); see also former 40 CFR 122.23(d)(2).

### C. THE MICHIGAN CAFO RULE

In light of the EPA's promulgation of the 2003 Federal CAFO Rule, "Michigan promulgated its own administrative rules specific to the NPDES for CAFOs,

which the EPA reviewed." *Sierra Club*, 277 Mich App at 536 (footnote omitted). Michigan's CAFO regulations are codified within Mich Admin Code, R 323.2102, R 323.2103, R 323.2104, and R 323.2196. *Sierra Club*, 277 Mich App at 536 n 18. Like the 2003 Federal CAFO Rule as originally promulgated, the Michigan regulations provide that "[a]ll CAFO owners or operators shall apply either for an individual NPDES permit, or a certificate of coverage under an NPDES general permit[.]" Rule 2196(1)(b); see also *Sierra Club*, 277 Mich App at 536-537. Also like the 2003 Federal CAFO Rule as originally promulgated, the Michigan regulations provide an exception to this requirement for CAFO owners and operators who have "received a determination from the department, made after providing notice and opportunity for public comment, that the CAFO has 'no potential to discharge[.]' "[3] Rule 2196(1)(b); see also *Sierra Club*, 277 Mich App at 536-537.

### D. THE *WATERKEEPER* DECISION

In 2003 and 2004, various plaintiffs sought review of the 2003 Federal CAFO Rule in the United States Court of Appeals for the Second Circuit.[4] See *Waterkeeper*, 399 F3d at 490, 497. Among these plaintiffs was a group of farming organizations that challenged the permitting scheme established by the federal rule. In particular, these plaintiffs argued that the EPA had exceeded its statutory jurisdiction by requiring all CAFOs, including those that were not actually discharging pollutants into

---

[3] The DEQ's determination that a CAFO has "no potential to discharge" is made pursuant to Rule 323.2196(4).

[4] The United States Court of Appeals has exclusive jurisdiction over challenges to the EPA's promulgation of "any effluent limitation" under the CWA. 33 USC 1369(b)(1); see also *Central Hudson Gas & Electric Corp v Environmental Protection Agency*, 587 F2d 549, 555 (CA 2, 1978).

the navigable waters, "to either apply for NPDES permits or otherwise demonstrate that they have no potential to discharge." *Id.* at 504.

The United States Court of Appeals began by observing that § 1342(a)(1) of the CWA authorizes the EPA to issue NPDES permits for "the *discharge of any pollutant or combination of pollutants.*" *Id.* (emphasis in original); see also 33 USC 1342(a)(1). "In other words," the *Waterkeeper* court continued, "unless there is a 'discharge of any pollutant,' there is no violation of the [CWA], and point sources are, accordingly, neither statutorily obligated to comply with EPA regulations for point source discharges, nor are they statutorily obligated to seek or obtain an NPDES permit." *Waterkeeper,* 399 F3d at 504. The *Waterkeeper* court then considered § 1362(12) of the CWA, which defines the phrase "discharge of any pollutant" as " '(A) any addition of any pollutant to navigable waters from any point source, [or] (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.' " *Waterkeeper,* 399 F3d at 504-505, quoting 33 USC 1362(12). On the basis of the language of § 1342(a)(1), as well as the definition of "discharge of any pollutant" set forth in § 1362(12), the court rejected the EPA's argument that it had statutory authority to promulgate rules requiring *all* CAFOs to seek and obtain an NPDES permit—even those CAFOs that were not actually discharging pollutants into the navigable waters:

> [I]n the absence of an actual addition of any pollutant to navigable waters from any point, there is no point source discharge, no statutory violation, no statutory obligation of point sources to comply with EPA regulations for point source discharges, and no statutory obligation of point

sources to seek or obtain an NPDES permit in the first instance. [*Waterkeeper*, 399 F3d at 505.]

The *Waterkeeper* court further disagreed with the EPA's argument that it was statutorily authorized to require the plaintiffs to seek and obtain NPDES permits because "all CAFOs have the *potential* to discharge pollutants." *Id.* (emphasis in original). Relying in part on *Natural Resources Defense Council v Environmental Protection Agency*, 859 F2d 156, 170 (CA DC, 1988), the *Waterkeeper* court ruled that "the Clean Water Act gives the EPA jurisdiction to regulate and control only *actual* discharges—not potential discharges, and certainly not point sources themselves." *Waterkeeper*, 399 F3d at 505 (emphasis in original). So, too, did the *Waterkeeper* court reject the EPA's argument that it had authority to require the plaintiffs to seek and obtain an NPDES permit because the term "point source" "is defined to mean not only 'any discernible, confined and discrete conveyance' from which pollutants 'are' discharged, but also 'any discernible, confined and discrete conveyance' from which pollutants '*may be*' discharged." *Id.*, quoting 33 USC 1362(14) (emphasis in original). The *Waterkeeper* court noted that "while point sources are statutorily defined to include potential dischargers, effluent limitations can, pursuant to 33 U.S.C. § 1311(e), be applied only to 'point sources of *discharge of pollutants*,' i.e. those point sources that are *actually* discharging." *Waterkeeper*, 399 F3d at 505 (emphasis in original).

In the end, the *Waterkeeper* court determined that the challenged provisions of the 2003 Federal CAFO Rule exceeded the scope of the EPA's statutory rulemaking authority as conferred by the CWA. The court ruled that even though the plaintiffs had the *potential* to discharge, the EPA lacked authority to require them

to seek and obtain an NPDES permit because they were not *actually* discharging pollutants into the navigable waters. *Id.* at 505-506. The *Waterkeeper* court therefore struck down the challenged provisions of the 2003 Federal CAFO Rule that required all CAFOs to either (1) seek and obtain an NPDES permit (irrespective of whether they actually discharge pollutants) or (2) demonstrate that they have no potential to discharge.[5]

### E. PROCEEDINGS IN THE NEWAYGO CIRCUIT COURT

On October 22, 2007, plaintiffs commenced the present action by filing a complaint for declaratory relief in the Newaygo Circuit Court. Relying in part on the *Waterkeeper* decision, plaintiffs alleged that Mich Admin Code, R 323.2196 (Rule 2196) violated the language of the CWA. Plaintiffs suggested that the federal and Michigan NPDES programs were intended to be coextensive and that the DEQ's authority to promulgate rules requiring CAFOs to obtain NPDES permits was therefore naturally constrained by the language of the CWA itself. Plaintiffs also alleged that Rule 2196 exceeded the scope of the DEQ's statutory rulemaking authority under Part 31 of the NREPA. Plaintiffs pointed out that, like the 2003 Federal CAFO Rule partially struck down in *Waterkeeper*, Rule 2196 purported to require all CAFOs to either (1) seek and obtain an NPDES permit (irrespective of whether they actually discharge pollutants), or (2) demonstrate that they have no potential to discharge. Relying on the rationale of *Waterkeeper*, plaintiffs alleged that the

---

[5] In the wake of the *Waterkeeper* decision, the EPA has made certain changes to the federal CAFO regulations. See Revised National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitations Guidelines for Concentrated Animal Feeding Operations in Response to the Waterkeeper Decision, 73 Fed Reg 70418 (November 20, 2008).

DEQ was without authority to promulgate any regulation requiring them to seek and obtain NPDES permits because they did not actually discharge any pollutants into the waters of Michigan. Plaintiffs asserted that, like the CWA, Part 31 of the NREPA authorizes administrative rulemaking with regard to *actual discharges only*. Lastly, plaintiffs alleged that by promulgating Rule 2196, the DEQ had violated the intent of the Legislature as expressed through § 229(a) of SB 1086, which ultimately became 2006 PA 343.[6] Among other things, plaintiffs requested that the circuit court (1) declare that the DEQ exceeded its statutory rulemaking authority by promulgating Rule 2196, (2) declare that Rule 2196 was arbitrary and capricious, (3) declare that Rule 2196 violated the intent of the Legislature to the extent that it purported to regulate CAFOs that did not actually discharge pollutants, (4) vacate Rule 2196, and (5) enjoin the DEQ from promulgating similar rules in the future.

On December 26, 2007, in lieu of filing an answer, the DEQ moved for summary disposition pursuant to MCR 2.116(C)(4) on the ground that the circuit court lacked jurisdiction over the present suit because plaintiffs had failed to exhaust certain requirements set forth in Michigan's Administrative Procedures Act (APA), MCL 24.201 *et seq.* The DEQ pointed out that, prior to filing the present declaratory judgment action in circuit court, plaintiffs had formally requested from the DEQ a declaratory ruling pursuant to § 63 of the APA, MCL 24.263. Specifically, plaintiffs had requested "a ruling declaring

---

[6] The language of § 229(a) of SB 1086 provided in pertinent part that the DEQ "shall not implement or enforce administrative rules, policies, guidelines, or procedures that . . . [r]equire a farm to obtain a [NPDES] permit under part 31 of the [NREPA] . . . if the farm has not been found by the [DEQ] to have a regulated discharge of pollutants into waters of this state."

that . . . [Rule 2196], which requires . . . [CAFOs] in the state of Michigan to apply for and obtain . . . [NPDES] permits, is not applicable to CAFOs that have not had and do not propose to have an actual discharge of pollutants . . . ." On August 24, 2007, the DEQ granted plaintiffs' request and issued a ruling in which it declared that "large CAFOs must apply for and obtain coverage under Michigan's NPDES permitting system unless the DEQ makes a determination that the CAFO has sufficiently demonstrated '[n]o [p]otential to [d]ischarge' pursuant to [Rule 2196]."

In its motion for summary disposition, the DEQ contended that rather than commencing the instant declaratory judgment action in circuit court, § 63 of the APA, MCL 24.263, had required plaintiffs to seek judicial review of the DEQ's declaratory ruling pursuant to Chapter 6 of the APA, MCL 24.301 *et seq.*, which governs judicial review in contested cases. See MCL 24.263 (providing that "[a] declaratory ruling is subject to judicial review in the same manner as an agency final decision or order in a contested case"). However, relying in part on *Michigan Ass'n of Home Builders v Dep't of Labor & Economic Growth Dir*, 276 Mich App 467, 480-481; 741 NW2d 531 (2007), vacated in part on other grounds 481 Mich 496 (2008), the circuit court determined that plaintiffs' request to the DEQ had, in reality, been a challenge to the *validity* of Rule 2196 rather than a request for a ruling on the *applicability* of Rule 2196 to "an actual state of facts" within the meaning of MCL 24.263. The court noted that, in responding to plaintiffs' request, the DEQ had not considered the rule's applicability to any given set of facts, but had merely reiterated what the plain language of Rule 2196 already clearly required—namely, that all large CAFOs must either seek and obtain an NPDES permit or satisfactorily demonstrate that they

have no potential to discharge. The court observed that plaintiffs' request for a declaratory ruling had raised "merely . . . a question of law" with "no need for factual development," and noted that although MCL 24.263 would have authorized the DEQ to issue a declaratory ruling concerning the *applicability* of Rule 2196 to a particular set of facts, there was no statutory authority permitting the DEQ to make rulings or pronouncements concerning the "substantive validity" of its own rule. Instead, the court concluded that the proper mechanism for challenging the substantive validity of Rule 2196 was an action for declaratory relief in the circuit court. Accordingly, the circuit court denied the DEQ's motion for summary disposition and allowed the instant declaratory judgment action to go forward.[7]

On October 3, 2008, plaintiffs moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that

---

[7] We perceive no error in the circuit court's ruling on this matter. As the circuit court properly concluded, plaintiffs did not truly request "a declaratory ruling as to the applicability to an actual state of facts of a . . . rule . . . of the agency" within the meaning of MCL 24.263. Instead, and more accurately, what plaintiffs actually requested was a simple declaration that Rule 2196 was invalid. As Dean LeDuc has explained in his treatise on Michigan administrative law, MCL 24.263 "empowers an agency to issue a declaratory ruling only as to the *applicability* of a rule, not as to its *validity*." LeDuc, Michigan Administrative Law (2001), § 8:13, p 576 (emphasis added). "The reason for this is obvious, an agency is unlikely to find its own rules invalid and those rules are presumed to be valid anyway. Courts will ultimately determine the validity of a rule." *Id.* Because plaintiffs sought to challenge the *validity* of Rule 2196 rather than its *applicability* to a particular state of facts, they were not required to ask the DEQ for a declaratory ruling under MCL 24.263 in the first instance, and were instead entitled to directly commence this declaratory judgment action in the circuit court pursuant to MCL 24.264. Nor did the exhaustion requirement of MCL 24.264 apply to plaintiffs given that they sought to challenge the validity of Rule 2196 rather than its applicability. See LeDuc, § 8:13, p 577. "The exhaustion requirement of [MCL 24.264] (requiring resort first to the submission of a [request for a] declaratory ruling) applies only when a plaintiff wishes to challenge the applicability of a rule to an actual state of facts." *Id.*

it was beyond genuine factual dispute that Rule 2196 was an invalid regulation and that they were entitled to judgment as a matter of law. In particular, plaintiffs argued that the DEQ's promulgation of Rule 2196 violated the language of the CWA, as interpreted in the *Waterkeeper* decision, and that it exceeded the scope of the DEQ's statutory rulemaking authority under Part 31 of the NREPA. Plaintiffs also argued that Rule 2196 was arbitrary, capricious, and inconsistent with the intent of the Legislature.

The DEQ opposed plaintiffs' motion and sought summary disposition in its favor pursuant to MCR 2.116(I)(2). The DEQ argued that the reasoning of the *Waterkeeper* decision was inapplicable to the present controversy and that the validity of Rule 2196 was purely a matter of state law. The DEQ claimed that it had full authority to promulgate Rule 2196 pursuant to §§ 3103 and 3106 of the NREPA, MCL 324.3103 and MCL 324.3106, and that these sections authorized it "to establish permit requirements that are more stringent and have greater specificity than [the] federal regulations." The DEQ also argued that Rule 2196 was neither arbitrary nor capricious, and that it fell squarely within the subject matter of Part 31 of the NREPA. Lastly, the DEQ pointed out that § 229(a) of SB 1086, which plaintiffs had referred to in support of their motion for summary disposition, was vetoed by Governor Granholm on August 15, 2006, and therefore never became part of 2006 PA 343, the DEQ appropriations act for fiscal year 2007.

The circuit court held oral argument on November 24, 2008. Plaintiffs' counsel pointed out that his clients were not currently discharging pollutants and had no present plans to discharge pollutants, and therefore argued that the DEQ was without authority to require

them to seek and obtain an NPDES permit. He explained his position by way of an analogy, remarking that the DEQ's application of Rule 2196 to his clients was "something akin to the Secretary of State asking all potential drivers to get a driver's license even if they are not going to use one." Counsel argued that neither the CWA nor the NREPA authorized the DEQ to promulgate Rule 2196. Although plaintiffs' counsel seemed to acknowledge that §§ 3103 and 3106 of the NREPA confer broad rulemaking authority on the DEQ, he argued that the language of § 3103, like the relevant language of the CWA at issue in *Waterkeeper*, "doesn't talk about potential or hypothetical . . . [discharges], it talks about actual [discharges]; it uses an active voice." He also argued that even though § 3106 specifically grants the DEQ authority to regulate municipal, industrial, and commercial discharges, it does not mention "agricultural" discharges. Thus, he contended that under the doctrine *expressio unius est exclusio alterius*, § 3106 does not authorize the DEQ to regulate "agricultural" discharges.

Counsel for the DEQ asserted that because the EPA had granted Michigan authority to administer its own NPDES program, the validity of the Michigan CAFO regulations was to be assessed solely according to Michigan law—not federal law. For this reason, counsel contended that "the *Waterkeeper* decision is really irrelevant in this matter." Counsel argued that the NREPA's grant of rulemaking authority to the DEQ was "broad enough" to encompass Rule 2196, even if the language of the CWA examined in the *Waterkeeper* decision did not grant the EPA similarly broad powers. Counsel for the DEQ also argued that both § 3103 and § 3106 of the NREPA provided "a solid legal foundation for [Rule 2196]" and that "Rule 2196 complies with . . . NREPA's underlying legislative purposes." With respect to plaintiffs' contention

that § 3106 does not allow the DEQ to regulate "agricultural" discharges because it mentions only municipal, industrial, and commercial discharges, counsel for the DEQ argued that CAFOs are clearly "commercial" operations and that the term "commercial" in § 3106 is expansive enough to encompass large-scale, for-profit agricultural activities such as those carried on by plaintiffs. Lastly, counsel argued that Rule 2196 was not arbitrary and capricious and that it was amply supported by the existing administrative record. He cited several studies, documents, and findings contained in the administrative record to demonstrate the serious environmental effects of CAFO discharges into the waters of this state. The circuit court took the matter under advisement.

On January 20, 2009, the circuit court issued a thoughtful and detailed opinion denying plaintiffs' motion for summary disposition and granting summary disposition in favor of the DEQ. Judge Anthony A. Monton reasoned in pertinent part:

> The plaintiffs advance three arguments to support their claim that Rule 2196 is invalid: (1) the rule violates federal law, because it is contrary to the Clean Water Act and regulations promulgated by the EPA; (2) the rule violates state law, because it exceeds the scope of its enabling act which is Part 31 of the Natural Resources Environmental Protection Act; and (3) the rule is arbitrary and capricious.
>
> As previously discussed, Michigan created its own NPDES program using state law, NREPA, for its authority. Federal law clearly contemplates that states may run their own programs, provided the regulations are at least as stringent as the federal program. 40 CFR Sec. 123.25.
>
> The <u>Waterkeeper</u> decision held that the federal enabling act, the Clean Water Act, was not broad enough to regulate potential discharges of animal waste. The effect of this decision would prohibit regulating potential discharges in

states where the EPA enforces the NPDES program and in states running their own programs under state enabling statutes that contain the same limitations as the Clean Water Act.

Michigan runs its own program under an enabling statute that is clearly more expansive than the federal Clean Water Act. For example, the scope of the Clean Water Act is limited to discharges into navigable waters in contrast to the broader scope of Michigan law, which includes discharges into all surface and underground waters. MCL [3]24.3103(1). This distinction, by itself, does not give the DEQ authority to regulate potential discharges, but it does serve to give it authority to regulate discharges that would not be covered by the Clean Water Act.

The fact that the DEQ adopted portions of federal regulations struck down by the Waterkeeper decision does not necessarily mean that the corresponding state regulation is invalid. Michigan used its own enabling statute and followed its own Administrative Procedures Act to [promulgate] Rule 2196, which took almost two years to complete. The EPA approved Rule 2196, and this approval represents its determination that the rule does not violate the federal Clean Water Act. Jurisdiction to challenge this determination is vested exclusively with the United States Court of Appeals under 33 USC 1369(b), and no such challenge has been filed. As a result, the real question in this case involves whether or not Rule 2196 complies with Michigan law.

The plaintiffs argue that Rule 2196 does indeed violate state law. The parties agree that this regulation must pass a three-part test to be valid: (1) the rule must be within the subject matter of its enabling statute; (2) the rule must comply with the legislative intent underlying the enabling statute; and (3) the rule must not be arbitrary and capricious. Dy[k]stra v DNR, 198 Mich App 482, 484 [499 NW2d 367] (1993). The parties also agree that NREPA is the applicable enabling act for Rule 2196 and that the rule fulfills the first prong of the three-part test. The parties disagree about whether the rule is consistent with NREPA's legislative intent and whether it is arbitrary and capricious.

[S]ections 3103 and 3106 of NREPA provide the author-
ity to adopt Rule 2196[.]

* * *

Section 3103 of NREPA plainly and broadly gives the
DEQ the authority to pass regulations designed to protect
the water resources of Michigan from waste disposal, and
this term is fairly interpreted to include the process of
collecting, storing, and removing waste from a CAFO. See
MCL 691.1416(j). There is no real dispute that CAFOs
generate a large amount of waste, and the improper
disposal of the waste can pollute Michigan's waters. The
language of these sections clearly contemplate[s] that, in
appropriate circumstances, the DEQ may assert its regu-
latory authority before there is an actual discharge of waste
into the waters.

The plaintiffs note that the legislature, in sections 3109
and 3112 of NREPA, requires a permit when someone
actually discharges waste or an oceangoing vessel actually
discharges ballast waters into Michigan's waters. They
argue that these provisions of NREPA suggest that DEQ's
authority to require a permit starts only if there has been
an actual discharge of waste. I disagree. Regulatory en-
abling statutes establish the general boundaries within
which an administrative agency may act, and, in this case,
sections 3103 and 3106 set these boundaries. The fact that
the legislature may prescribe specific things that the
agency must do within these boundaries does not negate
the broad grant of authority.

The plaintiffs argue that a budget bill for the 2007 fiscal
year (2006 P.A. 343) demonstrates . . . the legislative intent
that only actual discharges from CAFOs should be regulated.
This funding bill purported to prohibit the DEQ from expend-
ing funds to implement a program requiring CAFOs to obtain
a NPDES permit, unless they are actually discharging pollut-
ants into the water. In Governor Granholm's veto message,
she correctly noted that this portion of the legislation was
invalid, because it attempted to amend another statute by
reference. The legislature is certainly free to modify NREPA

to limit its broad grant of authority to the DEQ, but, a budget bill for the 2007 fiscal year does not accomplish this result. It was noted by the DEQ that the legislature did not impose a similar restriction on the expenditure of funds for the 2008 fiscal year.

Lastly, the plaintiffs contend that Regulation 2196 is invalid, because it is arbitrary and capricious. In Dykstra, the Court of Appeals expressed the principle that a rule is neither arbitrary [n]or capricious if it is rationally related to the purpose of the statute. Id., 491. For this prong of the three-part test, great deference must be given to the judgment of the administrative agency, and any doubts about meeting this part of the test must be resolved in favor [of] the agency. Id.

The practical effect of Rule 2196 is to expand the DEQ's regulations from CAFOs that make actual discharges, to all CAFOs, except those that are able to demonstrate no potential to discharge. To satisfy the third prong of the test, the DEQ must provide evidence in its administrative record to support its finding that the expanded rule is reasonably related to protecting water resources from pollution.

The plaintiffs claim that the DEQ's sole basis for adopting Rule 2196 was to comply with the [2003 Federal CAFO Rule] so that Michigan could maintain its NPDES program. The Waterkeeper decision invalidated the EPA's version of this rule; thus, the plaintiffs claim that the record is devoid of any rationale [sic] basis to support it. This argument requires that the administrative record supporting the rule be evaluated.

During the process of adopting rule 2196, the DEQ submitted a regulatory impact statement which supported its claim that the expanded rule was needed to protect the environment. It noted that previously, 30 CAFOs in Michigan had illegal discharges of animal waste into Michigan's water resources. The number of these discharges, by itself, was reason for the DEQ to examine whether the old rule was adequately protecting the environment. The DEQ also noted that illegal discharges of animal waste adds [sic] disease-

causing organisms such as E Coli to the water and that such waste causes the depletion of dissolved oxygen in water which can be fatal to aquatic life.

Additionally, the DEQ cited the studies and findings relied on by the EPA to expand the scope of its regulation to include potential discharges. Federal Register, Vol. 68, No. 29 (February 12, 2003), pp. 7234-7250. In these findings, the EPA explained the characteristics of animal waste which cause water pollution; it described how animal waste from CAFOs can makes [sic] its way into water resources; it revealed its statistics regarding the number of previous illegal discharges from CAFOs; and it did a cost/benefit analysis to support its claim that an expanded rule was necessary.

The EPA described several characteristics of animal waste that can adversely affect water quality: (1) it contains nitrogen and phosphorous which can cause eutrophication (excessive plant growth and decay) of water, leading to the depletion of oxygen and resultant reduction in water quality and aquatic life, which has been documented as a leading stressor in the Great Lakes; (2) the nitrogen from animal waste contains nitrates which can contaminate drinking water supplies; and (3) animal waste contains pathogens which are disease-causing organisms, and more that 150 pathogens found in such waste pose a risk to humans.

The EPA noted that land application of the waste (spreading manure on the ground or injecting it into the soil) is not the only method by which CAFOs have polluted water. It found that the improper storage of animal waste can result in spills onto the land, or leaks from storage areas can result in waste entering the underground and surface water.

In support of the need to expand the scope of regulations over CAFOs, the EPA stated the following:

. . . "A literature survey conducted for the proposed rule identified more than 150 reports or discharges to surface waters from hog, poultry, dairy, and cattle operations. Over 30 separate incidents of discharges from swine operations

between the years 1992 and 1997 in Iowa alone were reported by the State's Department of Natural Resources. The incidents resulted in fish kills ranging from about 500 to more than 500,000 fish killed per event. Fish kills or environmental impacts have also been reported by agencies in other States, including Nebraska, Maryland, Ohio, Michigan and North Carolina."

Id., 7237. The studies and findings referenced by the EPA provide additional support to the DEQ's contention that there is a rational basis to regulate potential discharges from CAFOs.

The plaintiffs correctly claim that certain CAFOs pose no risk to pollute water resources, and they should not be ensnared into a costly, complex regulatory scheme to address an environmental risk that does not exist. Rule 2196 reasonably deals with this fact by providing a method for CAFOs to be exempted from the permit requirement i[f] they pose no potential to discharge, and the DEQ states that two of the plaintiffs in this case have already received the benefit of this exemption.

In sum, I make the following rulings: (1) DEQ's Rule 2196 does not violate the federal Clea[n] Water Act; (2) the enabling act for this rule, Part 31 of NREPA, provides the DEQ the legal authority to regulate potential discharges of animal waste from CAFOs; and (3) the rule is rationally related to the DEQ's responsibility under NREPA to protect Michigan's water resources from pollution. I grant summary disposition in favor of the DEQ.

## II. STANDARDS OF REVIEW

We review de novo the circuit court's decision to grant or deny a motion for summary disposition. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). The scope of an administrative agency's statutory rulemaking authority and whether an agency has exceeded that authority are questions of law that we review de novo. *Consumers Power Co v Pub Serv Comm*, 460 Mich 148, 157; 596 NW2d 126 (1999); *In re Com-*

*plaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003). Whether an administrative rule is arbitrary and capricious is a question of law, as is the question whether a rule comports with the intent of the Legislature. See *Chesapeake & Ohio R Co v Pub Serv Comm*, 59 Mich App 88, 99; 228 NW2d 843 (1975); see also *Blank v Dep't of Corrections*, 222 Mich App 385, 407-408; 564 NW2d 130 (1997). Statutory interpretation is a question of law that we review de novo on appeal. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 102; 754 NW2d 259 (2008).

### III. DISCUSSION

Plaintiffs argue that the circuit court erred by denying their motion for summary disposition and by granting summary disposition in favor of the DEQ. Specifically, plaintiffs assert that Rule 2196 exceeds the scope of the DEQ's statutory rulemaking authority under the NREPA, that Rule 2196 is inconsistent with the intent of the Legislature, and that Rule 2196 is arbitrary and capricious. We disagree with plaintiffs in all respects.

### A. GENERAL PRINCIPLES

In Michigan, the rulemaking authority of a state administrative agency "derives from powers that the Michigan Legislature has granted." *Wolverine Power Supply Coop, Inc v Dep't of Environmental Quality*, 285 Mich App 548, 557; 777 NW2d 1 (2009). "It is firmly established that the [L]egislature may authorize the adoption by an administrative agency, charged with the administration of a particular enactment, of rules and regulations designed to effectuate the purposes of the enactment." *Sterling Secret Service, Inc v Dep't of State Police*, 20 Mich App 502, 513; 174 NW2d 298 (1969). At

the same time, however, it is well settled that "[a] statute that grants power to an administrative agency must be strictly construed and the administrative authority drawn from such statute must be granted plainly, because doubtful power does not exist." *In re Procedure & Format for Filing Tariffs Under the Mich Telecom Act*, 210 Mich App 533, 539; 534 NW2d 194 (1995).

To be enforceable, administrative rules must be constitutionally valid, procedurally valid, and substantively valid.[8] LeDuc, Michigan Administrative Law (2001), § 4:30, p 214. To determine the substantive validity of an administrative rule, Michigan courts employ a three-part test: (1) whether the rule is within the subject matter of the enabling statute, (2) whether it complies with the legislative intent underlying the enabling statute, and (3) whether it is arbitrary or capricious. *Luttrell v Dep't of Corrections*, 421 Mich 93, 100; 365 NW2d 74 (1984); see also *Ins Institute of Mich v Comm'r of Fin & Ins Servs*, 486 Mich 370, 385; 785 NW2d 67 (2010). Administrative rules "are valid so long as they are not unreasonable; and, if doubt exists as to their invalidity, they must be upheld." *Sterling Secret Service*, 20 Mich App at 514; see also *Toole v State Bd of Dentistry*, 306 Mich 527, 533-534; 11 NW2d 229 (1943).

The construction of a statute by a state administrative agency charged with administering it " 'is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons.' " *In re Complaint of Rovas*, 482 Mich at 103, quoting *Boyer-Campbell Co v Fry*, 271 Mich 282, 296; 260 NW 165

---

[8] Administrative rules are presumed to be constitutional. *Toole v State Bd of Dentistry*, 306 Mich 527, 533; 11 NW2d 229 (1943). Plaintiffs do not argue that Rule 2196 is constitutionally or procedurally invalid. Instead, plaintiffs argue only that Rule 2196 is substantively invalid.

(1935). Even so, " '[r]espectful consideration' is not equivalent to any normative understanding of 'deference' as the latter term is commonly used . . . ." *In re Complaint of Rovas*, 482 Mich at 108. Indeed, an administrative agency's interpretation "is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue." *Id.* at 103; see also *Ins Institute of Mich*, 486 Mich at 385. Thus, even a longstanding administrative interpretation cannot overcome the plain language of a statute. *Kinder Morgan Mich, LLC v City of Jackson*, 277 Mich App 159, 173; 744 NW2d 184 (2007). The Michigan courts have never adopted the *Chevron*[9] deference doctrine, which is followed by the federal courts.[10] *In re Complaint of Rovas*, 482 Mich at 111; see also *Kinder Morgan*, 277 Mich App at 172.

### B. INAPPLICABILITY OF FEDERAL LAW

On appeal, plaintiffs appear to have abandoned their argument that Rule 2196 is violative of the CWA. However, lest there be any lingering confusion on the subject, we wish to make clear that the scope of the DEQ's statutory authority to promulgate administrative rules concerning NPDES permitting in Michigan is purely a matter of state law. As explained earlier, the EPA granted Michigan the authority to administer its own NPDES program in 1973. Once the EPA has

---

[9] *Chevron, USA, Inc v Natural Resources Defense Council, Inc*, 467 US 837; 104 S Ct 2778; 81 L Ed 2d 694 (1984).

[10] Under *Chevron*, the federal courts will defer to an administrative agency's interpretation of a statute that it is charged with administering— even if that interpretation differs from what the courts believe to be the best interpretation—so long as the particular statute is ambiguous on the point at issue and the agency's construction is reasonable. *Chevron*, 467 US at 843-844; see also *Nat'l Cable & Telecom Ass'n v Brand X Internet Servs*, 545 US 967, 980; 125 S Ct 2688; 162 L Ed 2d 820 (2005).

approved a state's request to administer its own NP-DES program, that state's NPDES program is administered pursuant to state law rather than federal law. *Ringbolt Farms*, 714 F Supp at 1253; see also *Sierra Club*, 277 Mich App at 556 (ZAHRA, J., dissenting). The DEQ's administration of Michigan's NPDES permitting system is governed by and carried out pursuant to Part 31 of the NREPA. *Sierra Club*, 277 Mich App at 535-536. We reiterate that although a state's discharge standards and effluent limitations may not be less stringent than the federal standards and limitations, 33 USC 1370, a state that administers its own NPDES program may adopt discharge standards and effluent limitations that are more stringent than the federal standards and limitations, 40 CFR 123.1(i)(1); *West Virginia Highlands*, 625 F3d at 162.

### C. WHETHER RULE 2196 IS WITHIN THE SUBJECT MATTER OF THE NREPA

In order to determine whether the DEQ exceeded its statutory rulemaking authority in this case, we must begin with the first prong of the *Luttrell* test. This requires us to ask whether Rule 2196 falls within the subject matter of the NREPA, see *Luttrell*, 421 Mich at 100, and is essentially a question of statutory construction, see *Wolverine Power*, 285 Mich App at 557-558.

Our primary goal when interpreting a statute is to ascertain and give effect to the intent of the Legislature. *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998). " '[T]he Legislature's intent must be gathered from the language used, and the language must be given its ordinary meaning.' " *Id.* (citation omitted). The Legislature is presumed to have intended the meaning that it plainly expressed, *Rowland v Washtenaw Co Rd Comm*, 477

Mich 197, 219; 731 NW2d 41 (2007), and clear statutory language must be enforced as written, *Fluor Enterprises, Inc v Dep't of Treasury*, 477 Mich 170, 174; 730 NW2d 722 (2007). We presume that every word of a statute has some meaning and must avoid any interpretation that would render any part of a statute surplusage or nugatory. *Hoste v Shanty Creek Mgt, Inc*, 459 Mich 561, 574; 592 NW2d 360 (1999). As far as possible, effect should be given to every sentence, phrase, clause, and word. *Pohutski v Allen Park*, 465 Mich 675, 683-684; 641 NW2d 219 (2002).

Under Part 31 of the NREPA the DEQ has broad powers to regulate the discharge of pollutants into the waters of the state, to set standards concerning water pollution, to issue permits regarding the discharge or potential discharge of pollutants into Michigan's waters, and to compel compliance with those permits. See MCL 324.3103(1); MCL 324.3106; MCL 324.3112(1). In order to allow the DEQ to effectively perform its duties with regard to the control of water pollution under Part 31, the Legislature has expressly conferred various rulemaking powers upon the DEQ. See, e.g., MCL 324.3103(2); MCL 324.3103(3); MCL 324.3106; MCL 324.3107; MCL 324.3111; MCL 324.3112(6); MCL 324.3131(1). While many of the rulemaking powers conferred by Part 31 of the NREPA plainly do not apply in this case, the DEQ contends that it was authorized to promulgate Rule 2196 pursuant to the rulemaking authority set forth in §§ 3103 and 3106. The circuit court concurred with the DEQ, ruling that "sections 3103 and 3106 of NREPA provide the authority to adopt Rule 2196[.]" We agree that the DEQ had authority to promulgate Rule 2196 under the rulemaking provision of § 3103(2), but conclude that the DEQ lacked authority to do so under the rulemaking provision of § 3106.

There are two separate rulemaking provisions set forth in § 3103. Those provisions state in pertinent part:

> (2) The [DEQ] shall enforce this part and may promulgate rules as it considers necessary to carry out its duties under this part. . . .
>
> (3) The [DEQ] may promulgate rules and take other actions as may be necessary to comply with the federal water pollution control act . . . and to expend funds available under such law for extension or improvement of the state or interstate program for prevention and control of water pollution. [MCL 324.3103(2) and (3).]

Section 3103(2) contains a broad and general grant of rulemaking authority, authorizing the DEQ to promulgate any rules "as it considers necessary to carry out its duties under this part."[11] MCL 324.3103(2). The term "this part" in § 3103(2) clearly means Part 31 of the NREPA, which confers several "duties" upon the DEQ. In particular, the Legislature has given the DEQ the duty to "protect and conserve the water resources of the state" and to "control . . . the pollution of surface or underground waters of the state and the Great Lakes, which are or may be affected by waste disposal of any person." MCL 324.3103(1). The Legislature has also charged the DEQ with the duty to "establish pollution standards for lakes, rivers, streams, and other waters of

---

[11] In contrast, the rulemaking authority conferred by § 3103(3) is much more limited, granting the DEQ power to promulgate rules "necessary to comply with the [CWA] . . . ." MCL 324.3103(3). Although the challenged provisions of Rule 2196 parallel similar provisions that were contained in the 2003 Federal CAFO Rule as originally promulgated, the United States Court of Appeals for the Second Circuit has struck down these provisions as inconsistent with the language of the CWA. *Waterkeeper*, 399 F3d at 506. In light of the *Waterkeeper* decision, it cannot be said that Rule 2196 is "necessary to comply with the [CWA]" within the meaning of § 3103(3). We therefore conclude that the rulemaking authority conferred by § 3103(3) is inapplicable in this case.

the state in relation to the public use to which they are or may be put, as it considers necessary," to "issue permits that will assure compliance with state standards to regulate municipal, industrial, and commercial discharges or storage of any substance that may affect the quality of the waters of the state," to "set permit restrictions that will assure compliance with applicable federal law and regulations," and to "take all appropriate steps to prevent any pollution the [DEQ] considers to be unreasonable and against public interest in view of the existing conditions in any lake, river, stream, or other waters of the state." MCL 324.3106. Under the plain language of § 3103(2), the DEQ has authority to promulgate rules that it considers necessary to carry out any of these enumerated duties. MCL 324.3103(2). It is well settled that "an administrative agency may make such rules and regulations as are necessary for the efficient exercise of its powers expressly granted . . . ." *York v Detroit (After Remand)*, 438 Mich 744, 767; 475 NW2d 346 (1991).

Accordingly, the question becomes whether the subject matter of Rule 2196 is encompassed by, or falls within, any of the abovementioned statutory duties. We answer this question in the affirmative. Unlike the EPA, which is limited by the plain language of the CWA to regulating the "discharge of pollutants" or the "discharge of any pollutant," see 33 USC 1311(e); 33 USC 1342(a)(1); *Waterkeeper*, 399 F3d at 504-505, the DEQ has much broader duties and powers with respect to the regulation of water pollution under Part 31 of the NREPA. For instance, as explained earlier, the DEQ has the duty to "protect and conserve the water resources of the state," MCL 324.3103(1), and to "take all appropriate steps to prevent any pollution the [DEQ] considers to be unreasonable and against public interest in view of the existing conditions in any . . . waters of the

state,"[12] MCL 324.3106. Unlike the provisions of the CWA examined in *Waterkeeper*, these statutory duties do not speak of "discharges" at all; nor do they implicate only present or actual pollution. Indeed, the duty to "take all appropriate steps to *prevent* any pollution the [DEQ] considers to be unreasonable and against public interest," *id.* (emphasis added), clearly grants the DEQ authority to forestall potential pollution *even before* any discharge of pollutants ever occurs. The primary definition of the verb "prevent" is "to keep from occurring[.]" *Random House Webster's College Dictionary* (1997). As more fully explained in the dictionary, "[t]o PREVENT is to stop something effectually *by forestalling action and rendering it impossible*[.]" *Id.* (emphasis added). These definitions confirm that § 3106 confers upon the DEQ the responsibility of forestalling and rendering impossible any water pollution that it considers to be unreasonable and against the public interest, even before such pollution ever occurs. We consequently reject plaintiffs' argument that "section 3106 speaks only to <u>actual</u> discharges."

It is well established that an agency may exercise some discretion concerning the rules that it promulgates, as long as the ultimate rules are consistent with the legislative scheme. See *Bunce v Secretary of State*, 239 Mich App 204, 217; 607 NW2d 372 (1999); see also *Argo Oil Corp v Atwood*, 274 Mich 47, 52; 264 NW 285 (1935). Here, the DEQ has chosen to carry out its duties under Part 31 of the NREPA by requiring all CAFOs to either (1) seek and obtain an NPDES permit (irrespective of whether they actually discharge pollutants) or (2) satisfactorily demonstrate that they have no potential to discharge. Rule 2196 furthers the DEQ's statu-

---

[12] The term "[w]aters of the state" includes groundwater and all other watercourses and waters within the state of Michigan. MCL 324.3101(z).

tory duty to "prevent any pollution the [DEQ] considers to be unreasonable and against public interest," MCL 324.3106, by *preventing* all CAFO discharges before they occur, except as otherwise allowed under the terms of an NPDES permit. Moreover, as the circuit court correctly noted, Rule 2196 applies only to CAFOs that have a real potential to discharge pollutants, providing a complete exemption for CAFOs which establish that they truly pose "no potential to discharge." Rule 2196(1)(b). In sum, because Part 31 of the NREPA confers upon the DEQ the duty to "prevent any pollution" of the state's waters, MCL 324.3106, the DEQ had the statutory authority to promulgate Rule 2196 under the rulemaking provision of § 3103(2).

In contrast, the rulemaking provision of § 3106 is plainly inapplicable to the present controversy. That provision grants the DEQ authority to promulgate rules "restricting the *polluting content* of any waste material or polluting substance discharged or sought to be discharged . . . ." MCL 324.3106 (emphasis added). In other words, it grants the DEQ power to promulgate rules concerning the actual *content* or *composition* of waste and other polluting substances that are discharged into Michigan's waters. Purely by way of example, the rulemaking provision of § 3106 would authorize the DEQ to promulgate rules setting the maximum amount of mercury that could be contained in any waste effluent or the maximum number of harmful bacteria that could be contained in every gallon of discharged waste. However, the provision simply does not contain any language authorizing the DEQ to promulgate rules concerning the types of point-source dischargers (CAFOs, for example) that must seek and obtain NPDES permits. As explained earlier, "[a] statute that grants power to an administrative agency must be strictly construed and the administrative authority drawn from such statute must be granted plainly,

because doubtful power does not exist." *In re Procedure & Format for Filing Tariffs,* 210 Mich App at 539. An agency may not expand its rulemaking authority beyond that which the Legislature has delegated to it. *Jackson v Secretary of State,* 105 Mich App 132, 139; 306 NW2d 422 (1981).[13]

We conclude that Rule 2196 is within the scope of Part 31 of the NREPA and that the DEQ had authority, under § 3103(2), to promulgate Rule 2196 in furtherance of its statutory duty "to prevent any pollution" of the waters of the state. MCL 324.3106. We also conclude that, because the powers conferred upon the DEQ by Part 31 of the NREPA are broader than the powers conferred upon the EPA by the CWA, the reasoning of the *Waterkeeper* decision does not apply in this case. As the DEQ acknowledges in its brief on appeal, the effect of the *Waterkeeper* decision has been to "ma[ke] the Michigan CAFO Rule more stringent than the federal rule." But as noted earlier, Michigan is perfectly free to adopt NPDES permitting and discharge standards that are more stringent than the federal requirements. 40 CFR 123.1(i)(1); *West Virginia Highlands,* 625 F3d at 162.

### D. WHETHER RULE 2196 COMPLIES WITH THE LEGISLATURE'S INTENT

We must next determine whether Rule 2196 comports with the legislative intent underlying Part 31 of

---

[13] Given our conclusion that the rulemaking provision of § 3106 does not apply in this case, we need not consider plaintiffs' argument that, under the doctrine *expressio unius est exclusio alterius,* § 3106 does not authorize the DEQ to regulate "agricultural" discharges. Moreover, in light of our conclusion that the DEQ was authorized to promulgate Rule 2196 under the rulemaking provision of § 3103(2), we need not determine whether the authority to promulgate Rule 2196 was "necessarily implied" or "reasonably required for the execution of the powers expressly delegated" by any other section of Part 31 of the NREPA. *Jackson,* 105 Mich App at 139; compare LeDuc, § 4:03, pp 151-152.

the NREPA. See *Luttrell*, 421 Mich at 100. We conclude that it does. Plaintiffs' primary argument in this regard is that the Legislature intended to limit the DEQ's rulemaking powers to the regulation of *actual* or *imminent* discharges of waste or pollutants. In support of their argument, plaintiffs cite MCL 324.3110 (requiring the certification of wastewater treatment facility operators for any "entity that discharges liquid wastes into any surface water or groundwater"), MCL 324.3111 (requiring an annual report from any person "who discharges to the waters of the state"), MCL 324.3113(1) (requiring a person who intends to make a new or increased discharge to file an application describing the "proposed point of discharge" and "the estimated amount to be discharged"), and MCL 324.3120(1) (setting forth fees that must accompany an application for a permit "authorizing a discharge into surface water"). Plaintiffs argue that "[n]one of these requirements apply [sic] to a person that 'might' discharge." Plaintiffs additionally contend that, with the possible exception of MCL 324.3112(6) (requiring "all ocean going vessels engaging in port operations" to seek and obtain a permit), there are no provisions of Part 31 of the NREPA that extend NPDES permit requirements to point sources which are *not* actively discharging but which merely have the *potential* to discharge. We concede that many of the statutory sections relied on by plaintiffs are phrased in terms of present discharges. But plaintiffs' arguments wholly disregard the Legislature's specific command that the DEQ "take all appropriate steps to *prevent* any pollution the department considers to be unreasonable and against public interest in view of the existing conditions in any . . . waters of the state." MCL 324.3106 (emphasis added). The Legislature has declared that "[a]ll words and phrases shall be construed and understood according to the

common and approved usage of the language[.]" MCL 8.3a. As we have already explained, the common and approved meaning of the verb "prevent" is "to keep from occurring," or "to stop something effectually by forestalling action and rendering it impossible." *Random House Webster's College Dictionary* (1997). Accordingly, and for the reasons already stated, § 3106 confers upon the DEQ broad powers to preempt or forestall the pollution of the waters of this state before any pollutants are ever discharged in the first instance.

Plaintiffs also argue that Rule 2196 violates the Legislature's intent as expressed in § 229(a) of SB 1086, which ultimately became 2006 PA 343. As passed by the Michigan House of Representatives and Michigan Senate, § 229(a) provided in pertinent part that the DEQ "shall not implement or enforce administrative rules, policies, guidelines, or procedures that . . . [r]equire a farm to obtain a [NPDES] permit under part 31 of the [NREPA] . . . if the farm has not been found by the [DEQ] to have a regulated discharge of pollutants into waters of this state." However, while Governor Granholm signed SB 1086, she exercised her line-item veto authority[14] with respect to the language contained in § 229(a), stating in her veto message to the Michigan Senate that "boilerplate section[] 229 . . . [is] legally unenforceable, as [it] attempt[s] to amend [the NREPA] by reference."[15] 2 Public & Local Acts of Michigan (Session of 2006), Vetoes, p 2472. Because Governor

---

[14] "The governor may disapprove any distinct item or items appropriating moneys in any appropriation bill. The part or parts approved shall become law, and the item or items disapproved shall be void unless re-passed according to the method prescribed for the passage of other bills over the executive veto." Const 1963, art 5, § 19.

[15] "No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length." Const 1963, art 4, § 25.

Granholm vetoed the language contained in § 229(a), and because that language was not "re-passed . . . over the executive veto," Const 1963, art 5, § 19, by two-thirds of the members elected to and serving in both houses of the Legislature, the language contained in § 229(a) never became law, Const 1963, art 4, § 33. Indeed, following the governor's veto "[t]he Legislature took no further action to carry out its earlier expressed intention[.]" *Oakland Schools Bd of Ed v Superintendent of Pub Instruction*, 392 Mich 613, 618; 221 NW2d 345 (1974).

Notwithstanding the fact that § 229(a) of SB 1086 never became part of the final DEQ appropriations act for fiscal year 2007, plaintiffs maintain that the language contained in § 229(a) was still indicative of the Legislature's intent to limit the DEQ's authority to require certain CAFOs to seek and obtain NPDES permits. However, the Michigan Constitution sets forth the sole means by which the Legislature's intent may be expressed: (1) three readings in each house, (2) enactment, and (3) gubernatorial approval or passage over the governor's veto. Const 1963, art 4, § 26; Const 1963, art 4, § 33; see also *Craig v Larson*, 432 Mich 346, 365; 439 NW2d 899 (1989) (LEVIN, J., concurring in part and dissenting in part). Because the language of § 229(a) was vetoed by the governor and was not reenacted over her veto, that language cannot be cited as evidence of the Legislature's intent.

All told, the Legislature has conferred upon the DEQ broad powers to regulate the pollution of Michigan's waters, MCL 324.3103(1); MCL 324.3106, and to promulgate any rules that it "considers necessary to carry out its duties" under Part 31 of the NREPA, MCL 324.3103(2). It cannot be gainsaid that most CAFOs, by virtue of their sheer size and number of animals,

accumulate great amounts of waste that must either be stored or ultimately discharged. While plaintiffs claim that they have no present plans to discharge pollutants into Michigan's waters, there is always a possibility that large CAFOs will be forced to discharge some or all of their animal waste and that these discharges may eventually find their way into the "waters of this state." MCL 324.3106. Likely aware of these possibilities, the Legislature not only empowered the DEQ to regulate actual or present discharges, but also charged the DEQ with the duty to "take all appropriate steps to *prevent* any pollution the [DEQ] considers to be unreasonable and against public interest in view of the existing conditions in any . . . waters of the state." *Id.* (emphasis added). In order to carry out this duty, the DEQ has found it necessary to require all CAFOs to either (1) seek and obtain an NPDES permit (irrespective of whether they actually discharge pollutants), or (2) demonstrate that they have no potential to discharge. Rule 2196. The circuit court did not err by concluding that Rule 2196 comports with the intent of the Legislature.

### E. WHETHER RULE 2196 IS ARBITRARY AND CAPRICIOUS

The final question, then, is whether Rule 2196 is arbitrary and capricious. See *Luttrell*, 421 Mich at 100. "Arbitrary means fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances or significance, and capricious means apt to change suddenly, freakish or whimsical[.]" *Nolan v Dep't of Licensing & Regulation*, 151 Mich App 641, 652; 391 NW2d 424 (1986); see also *Bundo v City of Walled Lake*, 395 Mich 679, 703 n 17; 238 NW2d 154 (1976). In general, an agency's rules will be found to be arbitrary

only if the agency "had no reasonable ground for the exercise of judgment." *American Trucking Associations, Inc v United States*, 344 US 298, 314; 73 S Ct 307; 97 L Ed 337 (1953).

Plaintiffs argue that Rule 2196 is arbitrary and capricious for several reasons. First, plaintiffs contend that the DEQ arbitrarily modeled Rule 2196 on the 2003 Federal CAFO Rule, even after the DEQ knew or should have known that the *Waterkeeper* court had struck down the challenged federal regulation. Second, plaintiffs contend that Rule 2196 "violates common sense" because it is similar to a rule "requiring a 10 year old . . . to obtain a driver's license." Third, plaintiffs assert that the DEQ "flip-flopped on its earlier stated position" by promulgating Rule 2196 after the election of Governor Granholm. Lastly, plaintiffs argue that the DEQ acted arbitrarily by promulgating Rule 2196 without considering any "alternative options." We disagree in all respects.

It is true, by and large, that the DEQ modeled the language of Rule 2196 on the 2003 Federal CAFO Rule. It is also true that the DEQ went forward with the finalization of Rule 2196 even after the United States Court of Appeals for the Second Circuit had struck down the analogous provisions of the 2003 Federal CAFO Rule in *Waterkeeper*. But it does not necessarily follow that Rule 2196 is arbitrary and capricious. After the *Waterkeeper* decision, the DEQ determined that Rule 2196 was still necessary as a means to protect Michigan's waters from CAFO-originated pollution. Indeed, in its regulatory impact statement,[16] the DEQ had identified two different environmental studies to sup-

---

[16] Under the APA, an agency that proposes to promulgate a rule must complete and submit a "regulatory impact statement." MCL 24.245(3) and (4).

port its proposed promulgation of Rule 2196. The *Waterkeeper* decision did nothing to invalidate the findings of these studies or to otherwise undermine their reliability. Instead, the *Waterkeeper* decision was based entirely on the federal court's interpretation of the language of the CWA—language unlike that contained in Part 31 of the NREPA. The fact that the DEQ proceeded undeterred with its plans to promulgate Rule 2196 on the basis of the environmental studies cited in its previously published regulatory impact statement does not render the rule arbitrary or capricious. Again, we note that federal law allows Michigan to adopt discharge standards and effluent limitations that are more stringent than the federal NPDES standards and limitations. 40 CFR 123.1(i)(1).

We also reject plaintiffs' assertion that Rule 2196 is arbitrary and capricious because the DEQ promulgated it without considering any "alternative options." Contrary to plaintiffs' argument in their brief on appeal, the DEQ has not "repeatedly state[d]" that "the only reason for [Rule 2196] is the federal mandate[.]" As Judge Monton aptly observed in his detailed opinion, the DEQ carefully considered whether Rule 2196 was needed to deter ongoing illegal discharges of animal waste into the waters of this state. Given that numerous CAFOs without NPDES permits had already discharged waste into Michigan's waters, the DEQ concluded that it was reasonable and necessary to require all CAFOs to seek and obtain an NPDES permit or to satisfactorily demonstrate that they have no potential to discharge. We perceive no evidence that the DEQ failed to consider all of its available options.

Nor can we agree with plaintiffs' contention that Rule 2196 "violates common sense" because it is akin to a rule "requiring a 10 year old . . . to obtain a driver's

license." As explained earlier, CAFOs generate large amounts of animal waste and pose known risks to Michigan's water resources. Rule 2196 is rationally related to the Legislature's purpose to *prevent* the pollution of the waters of this state. See *Dykstra v Dep't of Natural Resources*, 198 Mich App 482, 491; 499 NW2d 367 (1993); *Binsfeld v Dep't of Natural Resources*, 173 Mich App 779, 787; 434 NW2d 245 (1988).

Finally, we fully acknowledge that counsel for the DEQ stated at oral argument before the circuit court that the promulgation of Rule 2196 was motivated, at least in part, by a change of administrations in Lansing. But Rule 2196 is not arbitrary and capricious merely because the DEQ changed its position with regard to CAFOs following the election of Governor Granholm. Administrative agencies such as the DEQ are part of the executive branch of state government. *In re Complaint of Rovas*, 482 Mich at 97. The executive power of the state is vested exclusively in the governor. Const 1963, art 5, § 1. The Framers of the Michigan Constitution desired to give the Governor "real control over the executive branch," *House Speaker v Governor*, 443 Mich 560, 562; 506 NW2d 190 (1993), including the power to appoint the heads of departments like the DEQ, Const 1963, art 5, § 3, and to supervise the affairs of each principal department, Const 1963, art 5, § 8. For our constitutional framework to operate as it was intended, each newly elected governor must possess the power and ability to manage the bureaucracy, to supervise the administrative agencies, and to influence those agencies' rulemaking decisions through his or her appointments and directives. It would be illogical, indeed, to conclude that an administrative rule is arbitrary and capricious merely because it differs from a prior rule that was promulgated under a previous administration.

On the facts before us, we simply cannot conclude that Rule 2196 is arbitrary or capricious. Rule 2196 is a regulation of general applicability that the DEQ intends to apply to all CAFOs of a certain size. Accordingly, it is not "apt to change suddenly, freakish or whimsical[.]" *Nolan*, 151 Mich App at 652. Nor is there any evidence that the DEQ was motivated by caprice, prejudice, or animus or that Rule 2196 was promulgated without reference to adequate principles or standards. See *id.* Instead, it strikes us that Rule 2196 was promulgated deliberatively, with reference to sufficient standards, and without improper motives. We recognize that plaintiffs are unhappy with Rule 2196, which will certainly impose new costs and requirements. But a rule is not arbitrary or capricious merely because it displeases the regulated parties. See *Binsfeld*, 173 Mich App at 786-787. Nor is a rule arbitrary or capricious simply because it causes some inconvenience or imposes new or additional requirements. See *Nolan*, 151 Mich App at 652. Although Rule 2196 may displease plaintiffs, we conclude that it is rationally related to the Legislature's purpose to prevent the pollution of the waters of this state and that it is therefore neither arbitrary nor capricious. *Dykstra*, 198 Mich App at 491.

### F. SCOPE OF THE ADMINISTRATIVE RECORD

Lastly, plaintiffs suggest that the DEQ has improperly attempted to bolster Rule 2196 by citing certain justifications for the rule that are not contained in the administrative record. It is true, at least in the federal context, that an agency must typically defend its actions on the basis of justifications contained in the administrative record rather than post hoc rationalizations developed during litigation. See, e.g., *Securities & Exchange Comm v Chenery Corp*, 332 US 194, 196-197; 67

S Ct 1575; 91 L Ed 1995 (1947). However, this issue is not properly before us because it is not contained in plaintiffs' statement of the questions presented. MCR 7.212(C)(5); *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 221; 761 NW2d 293 (2008); *McGoldrick v Holiday Amusements, Inc*, 242 Mich App 286, 298; 618 NW2d 98 (2000). We therefore decline to address it further.

### IV. CONCLUSION

Rule 2196 does not exceed the scope of the DEQ's statutory rulemaking authority. The rule falls squarely within the scope of Part 31 of the NREPA, is consistent with the underlying legislative intent, and is not arbitrary or capricious. We conclude that the DEQ was fully authorized to require CAFOs to either (1) seek and obtain an NPDES permit (irrespective of whether they actually discharge pollutants) or (2) satisfactorily demonstrate that they have no potential to discharge. The circuit court properly denied plaintiffs' motion for summary disposition and granted summary disposition in favor of the DEQ.

In light of our conclusions in this case, we need not consider the remaining arguments raised by the parties on appeal.

Affirmed. No taxable costs pursuant to MCR 7.219, a public question having been involved.

HOEKSTRA, P.J., and BECKERING, J., concurred with JANSEN, J.